985 F.2d 562
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Curtis JENNINGS, Defendant-Appellant.
 No. 91-5942.
 United States Court of Appeals, Sixth Circuit.
 Jan. 13, 1993.
 
 Before MERRITT, Chief Judge, and NATHANIEL R. JONES and BATCHELDER, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 In this drug courier profile case, the defendant, John Curtis Jennings ("Jennings"), appeals the District Court's denial of his motion to suppress evidence seized pursuant to a stop and search in the Cincinnati International Airport.
 
 I.
 
 2
 In the early evening hours of Sunday, November 4, 1990, Jennings entered the Cincinnati/Northern Kentucky International Airport after disembarking from an airplane arriving from Newark, New Jersey. Newark is a so-called "source city" for illegal narcotics. Jennings is African-American. Two plainclothes narcotics officers, Cincinnati Airport Police Department Officer David Bunning and DEA Task Force Officer James Swauger, observed the defendant deplane.[1] Upon entering the concourse the defendant turned away from the baggage claim area and exits. After proceeding about 75 feet he stopped, reversed direction, and walked "hurriedly" down the concourse towards the baggage claim area, looking over his shoulders several times. According to Officer Swauger, Jennings "was dressed in conservative business attire"--a grey suit, light blue or grey shirt and black shoes. Jennings also carried a folding garment bag. The bag appeared to the officers to be empty. In fact, it was later discovered to contain clothes. Attached to the bag was a yellow tag labeled "CVG." "CVG" denotes Cincinnati Airport. The CVG baggage tag is placed on luggage checked by passengers travelling to Cincinnati. The officers felt it highly unusual, indeed suspicious, for a Cincinnati-bound passenger to deplane with a CVG tag affixed to his carry-on item.
 
 
 3
 Their interest piqued, the officers followed the defendant down the concourse. At the baggage claim area the defendant paused at the baggage carousel for a few seconds, then walked past the car rental counters to within about three feet of a wall, turned around, walked past the car rental counters once again and went into the men's restroom. Officer Bunning noticed a white male exit the men's room immediately prior to the defendant entering it. Officer Swauger stated that one of Jennings' eyes appeared droopy and the other glassy. It was later revealed that the eye officer Swauger described as "droopy" has possible nerve damage and is capped by a scar. The officers also said that Jennings looked "high." A subsequent drug test of the defendant turned up negative.
 
 
 4
 Jennings remained in the restroom for only ten to twenty seconds during which time no one entered or exited. After he left, Officer Swauger entered the restroom and found it empty. Jennings then walked to the taxi desk to order a cab.
 
 
 5
 This series of observations made the officers suspicious. As a result, Officer Bunning approached the defendant as he moved toward the front doors to await a taxicab. Bunning identified himself as a police officer investigating narcotics and showed Jennings his badge. Jennings agreed to speak with Bunning. In response to Bunning's questions, Jennings stated that he had just arrived from New Jersey and produced a one-way airline ticket from Newark. The ticket bore the defendant's name, John Jennings, and showed that it had been purchased with an American Express Card. Drug couriers are believed to purchase their airline tickets typically with cash or with a credit card in a name other than their own. Bunning also asked Jennings to produce his driver's license. Jennings complied. Uncharacteristic of drug couriers, the name on the license matched the name on the ticket. Jennings told the officer that he lived in Covington, Kentucky and had gone to New Jersey to visit a sick relative. Jenning testified that Officer Bunning's questioning was conversational in tone. At no time did Officer Bunning display his gun.
 
 
 6
 A salient feature of this case is that Officer Bunning testified that the name on the airline ticket and driver's license jogged his memory. Apparently some five years earlier Officer Bunning had received information about a John C. Jennings who lived in Covington, who dealt in cocaine, and who was related to another Airport Police Officer, Rick Jennings. Consequently, Bunning asked the defendant if he knew Officer Jennings. The defendant replied that he was Rick Jennings' uncle. Bunning then returned the driver's license. By this time, Officer Swauger had returned from the men's room to join Officer Bunning.
 
 
 7
 Officer Bunning then asked Jennings if he could search his garment bag. Jennings consented to the search. Bunning gave Jennings the choice of moving to a more private area or remaining in the open terminal. Jennings opted for the more private area. Officer Bunning took possession of the bag and led Jennings to a small first aid/police room a short distance away.
 
 
 8
 After a search of the garment bag produced no items of contraband or controlled substances, Bunning asked Jennings if he could conduct a pat-down search. Bunning testified that Jennings replied "yes, go ahead," and held his hands up in the air. Officer Bunning told Jennings to unbuckle his pants and to pull down his pants and underwear. Bunning commenced his search at the defendant's ankles and moved upward, finding nothing until he reached Jennings' jacket. According to Bunning, he felt a lump in the right pocket, reached into the pocket and removed a white envelope which he could see contained a large number of yellow pills. Bunning claims the envelope was unsealed. When Jennings objected to the removal of the envelope, Bunning replied, "It's too late, I could see the pills inside."
 
 
 9
 Jennings' version of the pat-down differs slightly. Jennings testified that after he pulled up his pants Bunning asked him to empty his pockets. After emptying his back pockets he removed the envelope. According to Jennings, he was preparing to hand it to Bunning when Bunning snatched it from him. Jennings claims that over his protest Bunning tore open the envelope and looked inside. Jennings nevertheless admits that when Bunning took the envelope it was "a little open at the end." Bunning placed Jennings under arrest. The envelope was later found to contain 820 four-milligram tablets of dilaudid.
 
 
 10
 A federal grand jury returned a one-count indictment charging the defendant with possession with intent to distribute a controlled substance, in violation of 21 U.S.C. 841(a)(1). At arraignment the defendant entered a plea of not guilty. The defendant moved to suppress the evidence seized by the officers. A suppression hearing was held, whereupon the Magistrate recommended that the defendant's motion be denied. Specifically, the Magistrate found that the defendant freely consented to the search of his garment bag. The Magistrate was silent about consent to the pat-down but noted that "Jennings raised his hands in the air as if in compliance" with Bunning's request for a pat-down. The Magistrate further remarked that "the evidentiary testimony convinces me ... that race alone was not the precipitating or sole factor" for the stop. Joint Appendix at 49.
 
 
 11
 The District Court adopted the Magistrate's Report and Recommendation over the defendant's objections. In May 1991 the defendant entered a conditional plea to the charge while reserving his right to appeal the denial of the motion to suppress. See Fed.R.Crim.P. 11(a)(2). In July 1991 Jennings was sentenced to 51 months of imprisonment and a five-year term of supervised release.
 
 II.
 
 12
 On appeal Jennings challenges the constitutionality of his stop and search. He claims his initial questioning by the officers violated the Fourteenth Amendment because it was motivated by considerations of race. He claims his Fourth Amendment rights were violated because he did not consent to the later pat-down search.
 
 
 13
 We review the District Court's factual findings in a suppression hearing under the clearly erroneous standard. United States v. Kelly, 913 F.2d 261, 264 (6th Cir.1990). We review de novo the District Court's determination as to whether those facts establish a seizure in violation of the Fourth Amendment. United States v. Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir.1988).
 
 A. Airport Stop and Questioning
 
 14
 Jennings claims that the evidence seized by the officers should be excluded because the seizure is tainted by the officers' violation of his Constitutional rights. Specifically, he argues that officers Bunning and Swauger are predisposed to stopping persons of color, do in fact stop persons on the basis of their race, and stopped him because he is African-American. In short, Jennings argues that the officers violated the rights guaranteed him under the Equal Protection Clause of the Fourteenth Amendment.
 
 
 15
 It is one thing to sanction suspicionless police sweeps where, in "dragnet" fashion, officers descend on randomly gathered groups of individuals to question them and even request permission to search their belongings. See Florida v. Bostick, 111 S.Ct. 2382, 2386 (1991); INS v. Delgado, 466 U.S. 210 (1984). It is quite another matter, however, to uphold police action that targets individuals for stopping and questioning on the basis of their race or ethnicity. Such police behavior is neither random nor indiscriminate. It is particularized and discriminatory.
 
 
 16
 To assess the legality of airport stops and searches consented to by defendants, we undertake a three-part analysis. United States v. Garcia, 866 F.2d 147, 150 (6th Cir.1989). First, we determine whether the initial contact between the suspect and the law enforcement officer was permissible. Second, we decide whether the subsequent detention was supported by a reasonable, articulable suspicion. United States v. Mendenhall, 446 U.S. 544, 549 (1980). Finally, we determine whether the resulting search was consented to. Garcia, 866 F.2d at 150. We begin with the initial encounter between Officers Bunning and Swauger and John Jennings.
 
 
 17
 When a consensual interview takes place, a seizure has yet to occur, and so the Fourth Amendment is not called into play. See Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Flowers, 909 F.2d 145, 147 (6th Cir.1990); United States v. Collis, 766 F.2d 219, 221 (6th Cir.1985) (a law enforcement officer's "quest for voluntarily given information does not constitute a seizure under the fourth amendment"). That does not mean, however, that a consensual interview does not implicate the Fourteenth Amendment. To our knowledge no court has held that "where first encounters are consensual, racial considerations are irrelevant." United States v. Taylor, 956 F.2d 572, 579 (6th Cir.1992) (en banc) (Guy, J., concurring).
 
 
 18
 Central to the Equal Protection Clause of the Fourteenth Amendment "is the prevention of official conduct discriminating on the basis of race." Washington v. Davis, 426 U.S. 229, 239 (1975). Law enforcement is quintessential official conduct--the police function being "one of the basic functions of government." Foley v. Connelie, 435 U.S. 291, 297 (1978). A law enforcement officer would be acting unconstitutionally were he to approach and consensually interview a person of color solely because of that person's color, absent a compelling justification. Further, evidence seized in violation of the Equal Protection Clause should be suppressed. "[N]o distinction can logically be drawn between evidence obtained in violation of the Fourth Amendment and that obtained in violation of the Fourteenth. The Constitution is flouted in either case." Elkins v. United States, 364 U.S. 206, 215 (1960).[2]
 
 
 19
 Racial classifications "are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be 'necessary.... to the accomplishment' of their legitimate purpose." Palmore v. Sidoti, 466 U.S. 429, 432 (1984) (citations omitted). "Determining whether invidious discriminatory purpose was a motivating factor" behind the officers' actions "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 266 (1977). In order to show that an equal protection violation has occurred, the defendant must show, by a preponderance of the evidence, that the officers who stopped him single out racial minorities for treatment different from the treatment given to non-minorities. The defendant could try to do this through evidence that these officers stop individuals on account of their race, or by offering statistical proof of some sort, for example about a larger population of airport narcotics officers, from which a strong inference could be made that the officers here engaged in intentional discrimination. Assuming the defendant makes such a showing, the burden then would shift to the government to rebut the presumption of unconstitutional action or to identify a compelling governmental interest for the race-based airport stops. See Arlington Heights, 429 U.S. at 270-71 n. 20. If the government did not meet this burden, then the court would be in a position to find that the defendant's equal protection rights had been violated.
 
 
 20
 Viewed with regard for principles of equal protection, the facts of this case are disturbing. The record reflects that Swauger, a veteran officer versed in the use of drug courier profiles, admits that half the people he stops at the Cincinnati airport are either Hispanic or Black. Joint Appendix at 140 (Officer Swauger testifying).[3] "Clearly," the defendant argues, "the Hispanic and Black percentages are disproportionate and suspect" in light of the assumption that Blacks and Hispanics comprise far less than fifty percent of the airline passengers using the Cincinnati airport. Officer Swauger's admission casts considerable doubt on the race-neutral motivations behind the officers' stopping and questioning of defendant. Indeed, the average air traveler's experience instructs that Blacks and Hispanics comprise far less than fifty percent of all airline passengers. One therefore suspects that Officer Swauger's reasons for stopping these individuals "is less likely to be inarticulable than unspeakable." Bostick, supra, at 2390 n. 1 (Marshall, J., dissenting). The particular facts relied upon by the officers for stopping Jennings do little to alleviate doubt as to the race-neutral character of the officers' actions.
 
 
 21
 Almost all of the reasons cited by officers Swauger and Bunning to justify their stop and questioning of the defendant relate to conduct or characteristics shared by large numbers of innocent travellers. See Reid v. Georgia, 448 U.S. 438, 441 (1980) (conduct or circumstances that "describe a very large category of presumably innocent [persons]" is not sufficient to constitute a reasonable suspicion). We think it not uncommon to make a wrong turn in an airport terminal after deplaning, only to catch oneself and reverse direction. Neither is it uncustomary for passengers to walk hurriedly towards the baggage claim area. Nor do we think it noteworthy for a passenger to carry a garment bag displaying an old airport luggage tag. Items such as garment bags are often checked through one trip, only to be carried on board a subsequent flight. That the bag's owner neglected to remove the airport tags from an earlier trip is inconsequential. What is more, we previously have viewed with skepticism the DEA's designation of certain cities as "source cities"--a classification used by DEA agents to single out particular passengers for stopping, questioning, and searching. See United States v. Andrews, 600 F.2d 563, 566-67 (6th Cir.), cert. denied sub nom. Brooks v. United States, 444 U.S. 878 (1979) ("[O]ur experience with DEA agent testimony ... makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center."). "We cannot allow law enforcement officers to cloak what may fairly be characterized as a racist practice in a generic drug courier profile that openly targets African-Americans." Taylor, 956 F.2d at 582 (Keith, J. dissenting).
 
 
 22
 One's intuition in this case based upon the facts in the record is that the officers stopped and questioned John Jennings because he is African-American. Nevertheless, it is important to distinguish between intuition and proof that meets the preponderance of evidence standard. The defendant fails to show by a preponderance of the evidence that race constituted a motivating factor in the stop and questioning. The defendant was unable to show, for example, that statistically African-Americans represent a small minority of passengers deplaning in Cincinnati. Neither does he provide statistics as to the racial make-up of domestic airline passengers for the year in question, 1990.[4] In the absence of judicially noticeable facts which would lend support to the defendant's assumption that Officer Swauger's stop-and-questioning practices impose unequal burdens on African-Americans and Hispanics, the defendant's equal protection claim cannot succeed.
 
 B. Terry Stop and Frisk
 
 23
 The Government acknowledges that a Terry stop took place when Officer Bunning took the defendant's garment bag and, together with Officer Swauger, escorted Jennings to the small police room. See Terry v. Ohio, 392 U.S. 1, 16 (1967) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" for purposes of the Fourth Amendment's regulation of "seizures."). The second step of the Garcia analysis requires us to determine whether the Terry stop was supported by reasonable suspicion.
 
 
 24
 It is not clear that reasonable suspicion--a rather undemanding standard--is established on the facts of this case. This issue is obviated, however, by the fact that Jennings consented to the stop and search. Although generally considered unreasonable, a warrantless search as occurred here is valid if conducted pursuant to the person's consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Where there is no warrant the burden of proving consent is on the government. Florida v. Royer, 460 U.S. 491, 497 (1983). The consent must be freely and voluntarily given, and this must be proven by "clear and positive" proof. United States v. McCaleb, 552 F.2d 717, 721 (6th Cir.1977). Consent is a question of fact, and the District Court's decision regarding consent will not be overturned unless clearly erroneous. Id. at 720.
 
 
 25
 Jennings objects to the District Court's finding that he consented to the search of his person. He argues that there is nothing in the record to support his supposed consent to the pat-down. Alternatively, he argues that even if he did consent to the pat-down, his "consent obtained subsequent to the closing of the door of the [small] room should be scrutinized as to whether it was given freely and voluntarily." He notes that the intimidation occasioned by the small room and the two officers was compounded by the fact that he was not told that he had a right to refuse to give consent to search.
 
 
 26
 After fully reviewing the record, we are satisfied that the District Court's finding that the defendant freely consented to the pat-down search is not clearly erroneous. The Court credited Officer Bunning's testimony that the defendant said "yes, go ahead," in response to Bunning's pat-down request, and then held his hands up in the air. Further, we are not persuaded that the search of the defendant's person in the small police room created an atmosphere so coercive as to vitiate consent.
 
 III.
 
 27
 For the foregoing reasons we AFFIRM the judgment of the District Court and uphold the defendant's conviction.
 
 
 28
 BATCHELDER, Circuit Judge, concurring in the result.
 
 
 29
 I agree that the district court properly denied the motion to suppress. Therefore, I concur in the result reached by the majority. I write separately, however, to voice my fundamental disagreement with a number of aspects of Chief Judge Merritt's opinion.
 
 
 30
 Two trained police officers, on narcotics assignment in a major airport, observed Jennings deplane carrying what appeared to be an empty bag. They observed him walk to the concourse, change directions, walk to within three feet of a wall, change directions again, and enter a restroom. At that point, Officer Bunning, later joined by Officer Swauger, approached Jennings and asked him if he would mind answering some questions. No guns were displayed. No other force or threat of force was used. This was a consensual encounter, and, up to this point, the Fourth Amendment simply was not implicated. See Florida v. Bostick, 111 S.Ct. 2382, 2386 (1991) (An "encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.").
 
 
 31
 Following this lawful encounter, Jennings validly consented to accompany the officers to another area of the airport and validly consented to a search of his garment bag and person. The search of Jennings's person revealed illegal drugs. The officers then lawfully seized the drugs and placed Jennings under arrest.
 
 
 32
 The foregoing analysis should have been sufficient to end this case. Instead, however, in dicta, the majority engages in a freewheeling equal protection, consensual encounter analysis. I believe not only that it is unnecessary to undertake this analysis, but that it is necessary not to undertake the analysis.
 
 
 33
 The majority concedes that although its "intuition" is that Jennings was approached on the basis of his race, the district court properly denied the motion to suppress, because Jennings failed to meet his burden of proof. Nonetheless, the majority proposes that the Fourth Amendment exclusionary rule be broadened to include evidence seized "in violation of the Equal Protection Clause" of the Fourteenth Amendment. --- F.2d ----, ---- (6th Cir.1993). The majority quotes from Elkins v. United States, 364 U.S. 206, 215 (1960): "[N]o distinction can logically be drawn between evidence obtained in violation of the Fourth Amendment and that obtained in violation of the Fourteenth. The Constitution is flouted equally in either case." Id. However, the reference in Elkins to the "Fourteenth Amendment" is a reference to the Due Process Clause of the Fourteenth Amendment, through which federal constitutional rights are made applicable to the states. See id. ("To the victim it matters not whether his constitutional right has been invaded by a federal agent or a state officer."); see also id. at 223 ("[W]e hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial."). Elkins provides absolutely no support for the majority's position regarding the Equal Protection Clause of the Fourteenth Amendment.
 
 
 34
 Even if Elkins supported the proposition for which the majority cites it, there has been absolutely no showing of a stop or a seizure of evidence to which the exclusionary rule could even arguably be applied.
 
 
 35
 The majority concedes that what occurred in this case was a consensual encounter. The Supreme Court has made it abundantly clear that law enforcement officers need no reason whatever to approach citizens for the purpose of engaging in consensual encounters. See, e.g., Bostick, 111 S.Ct. at 2386 ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage as long as the police do not convey a message that compliance with their requests is required.") (citations omitted). But in spite of the fact that the majority has not cited (and I have not found) a single case in which a court has struck down a consensual encounter as violative of the Equal Protection Clause of the Fourteenth Amendment,[1] the majority proposes a burden-shifting analysis to be used when a member of a minority is approached by law enforcement officers during an investigation and a consensual encounter ensues.
 
 
 36
 I do not believe this court, in a case in which the issue need not be reached, should enunciate a radically new and unsupported framework for analyzing consensual encounters. District courts and law enforcement officers need clear direction regarding what officers may and may not do when determining whether to approach and permissively question an individual as part of a drug investigation. To set forth for the first time, in dicta, an entirely new test for law enforcement officers to apply to encounters involving drug investigations is wholly inappropriate. Although the dicta in the majority opinion are not technically binding, they are now "out there," and it will be left to the district courts and law enforcement officers to speculate upon their meaning and force.
 
 
 37
 Particularly troubling is the fact that the burden-shifting analysis contained in that dicta suggests that the holding in Bostick is applicable only to individuals who are not members of racial minorities or any other suspect classification. If the constitutionality of a consensual encounter, which requires no articulable or particularized suspicion for its support, must now be scrutinized in terms of a traditional equal protection analysis whereby the defendant may produce evidence from which an inference may be drawn of invidiously discriminatory motivation, and the law enforcement officer must rebut that inference by demonstrating some non-racial reason for initiating the encounter, then, clearly, the encounter must be based upon some articulable or particularized suspicion or the inference of invidious motivation cannot be rebutted. Since there is no precedent extant for this proposition, I believe it is wholly irresponsible for this court to suggest it in the abstract.
 
 
 38
 I share the majority's concern at the prospect that officers may, without offending Fourth Amendment law, adopt a "policy" of consensually encountering only, or mostly, members of minorities.[2] However, the premise underlying an equal protection claim is that someone acting under color of law has deprived a citizen of a constitutional or statutory right on the basis of a classification into which that citizen fits. Because a Fourth Amendment "seizure" implicates rights, such a seizure may not be based on discriminatory motives.
 
 
 39
 What is involved here, both on the facts of this case and under the majority's proposed analysis, is not an arrest or an investigatory stop, i.e., not a seizure, but a consensual encounter. There is no constitutional right not to be consensually encountered by law enforcement officers. Because purely consensual encounters infringe upon no constitutional rights, I do not believe we should engraft a new requirement that law enforcement officers justify their choice of encounterees.
 
 
 40
 I reiterate that I do not wish to be misunderstood as sanctioning a policy permitting consensual encounters of citizens solely on the basis of their minority status. I cannot, however, subscribe to the majority opinion. In my view, the majority position is not only unsupported, but also is likely to introduce further complications into an already complex area of the law. I fear that the result will be greater confusion and greater uncertainty in an area of the law that could surely benefit from less of both.
 
 
 
 [1]
 Officer Bunning is an eleven year veteran of the Airport Police Department. At the time of the defendant's arrest, he had been investigating narcotics for almost three years and had received approximately 260 hours of narcotics-related training. Officer Swauger has been employed as a police officer by the City of Cincinnati for twenty years. At the time of the defendant's arrest, he had investigated narcotics trafficking for fifteen years, had been a member of the DEA task force for almost three years, and had received over 260 hours of narcotics-related training
 
 
 [2]
 It is a touchstone of Fourth Amendment jurisprudence that evidence obtained by law enforcement officers in violation of certain guarantees of the Constitution is inadmissible in state or federal criminal trials upon objection by a proper party. The exclusionary rule serves the primary purpose of deterring unlawful police conduct by "compel[ling] respect for the constitutional guaranty in the only effectively available way--by removing the incentive to disregard it." Elkins, 364 U.S. at 217. See also Mapp v. Ohio, 367 U.S. 643, 648 (1961) (same). This deterrence rationale applies also to evidence tainted by violations of the Fourteenth Amendment
 Arguably, the exclusionary rule as applied to Fourth Amendment violations advances non-deterrence ends, too. For example, by keeping tainted evidence out, the exclusionary rule prevents courts from becoming "accomplices in the willful disobedience of a Constitution they are sworn to uphold." Elkins, 364 U.S. at 222-23. See also Mapp, 367 U.S. at 659. Further, suppression of tainted evidence will "assur[e] the people--all potential victims of unlawful government conduct--that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." United States v. Calandra, 414 U.S. 338, 357 (1974) (Brennan, J., dissenting). See generally, 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 1.1(e) (1987). Presumably, these salutory effects would accompany the application of the exclusionary rule to the Equal Protection Clause of the Fourteenth Amendment as well.
 
 
 [3]
 This court has heard other cases involving airport narcotics agents stopping an allegedly disproportionate number of persons of color while purporting to act in accordance with drug courier profiles. See United States v. Taylor, 956 F.2d 572, 581 n. 1 (1992) (en banc) (Keith, J., dissenting) ("One of the officers admitted at the evidentiary hearing that at least seventy-five percent of those followed and questioned in these consensual police stops are black."); United States v. Sotolongo, 1992 WL 68281, 1992 U.S.App. LEXIS 6756 (6th Cir. Apr. 6, 1992) (per curiam) (unpublished opinion) (Jones, J., dissenting) (same Memphis airport officers involved in Taylor admit to stopping poorly dressed black Cuban without reasonable suspicion). Drug enforcement agents at Nashville's International Airport have come under attack for alleged racial bias. In February 1991, agents stopped Willie Jones, a Black Nashville landscaper and confiscated $9,000, but did not charge him with any crime. In March 1991, agents stopped Samuel Carter, a Bridgestone supervisor who was on his way to his brother's funeral. In an interview Carter said, "I can think of absolutely nothing which I did which was ... materially different from hundreds of other passengers travelling at the same time. The only conclusion I can draw is that I was stopped and interrogated ... because I dressed casually and I am black." Phil Williams, Man Says Airport Questioning Racial, THE TENNESSEAN, Sept. 1, 1992, at 2A. The similar, highly publicized case of baseball Hall of Famer Joe Morgan is discussed in Taylor, 956 F.2d at 582-83. Through such cases, this court is beginning "to see in the round rather than the flat, and to gain some understanding of the whole in action." KARL LLEWELLYN, THE COMMON LAW TRADITION--DECIDING APPEALS 263 (1960)
 The arbitrariness of the observations upon which narcotics officers purport to base their stops is revealed by the following comparison. In the case at hand, Jennings wore "conservative business attire," carried a garment bag, and walked "hurriedly" through the airport. In United States v. Garcia, 866 F.2d 147 (6th Cir.1989), "Garcia and Wolfe were [also] stopped by [drug agents] at the Greater Cincinnati Airport.... The agents' suspicions appeared to be aroused mainly by the defendants' attire. They were both wearing black t-shirts and bib overalls in contrast to the majority of business travellers, who wore suits.... [Garcia and Wolfe] walked at a normal pace through the airport...." 866 F.2d at 149. Although the opinion does not identify the races of the defendants, the surname "Garcia" suggests that at least one of the defendants was a person of color.
 
 
 [4]
 That the record is inadequate to support such a claim is not surprising. The DEA does not keep comprehensive statistics on the drug courier profile program. See Becton, The Drug Courier Profile: "All Seems Infected that Th' Infected Spy, As All Looks Yellow to the Jaundiced Eye," 65 N.C.L.REV. 417, 418 n. 4 (1987). (Vincent Morgano, agent in charge of Nashville's DEA office says that at the Nashville airport no official statistics are kept. Phil Williams, Man Says Airport Questioning Racial, THE TENNESSEAN, Sept. 1, 1992, at 2A.). Thus, it is difficult to discern to what extent Officer Swauger's "50%" quotient for minority stops reflects the practices of airport narcotics officers in Cincinnati and elsewhere. It is unknown whether the Cincinnati International Airport keeps track of the racial composition of travellers passing through its facility on a yearly, or even daily basis. Specific airlines may attempt to compile such statistics with respect to their passengers, and may further break the statistics down for particular routes
 
 
 [1]
 The majority quotes from a concurring opinion in this court's en banc decision in United States v. Taylor, 956 F.2d 572 (6th Cir.) (en banc ), cert. denied, 113 S.Ct. 404 (1992), in which Judge Guy disagrees with the proposition that "where first encounters are consensual, racial considerations are irrelevant." Id. at 579 (Guy, J., concurring). This concurring opinion was not joined in by any other judges and, therefore, represents the views of only one member of this court. Moreover, although Judge Guy reasoned that consensually encountering only minorities would raise "serious constitutional concerns," id. (footnote omitted) (Guy, J., concurring), he also acknowledged that there would be situations in which the deliberate selection of minorities as "targets" might be constitutional. Id. at 579-80 n. 2 (Guy, J., concurring)
 
 
 [2]
 The majority also points to testimony by Officer Swauger that "half the people he stops at the Cincinnati airport are either Hispanic or Black." --- F.2d at ---- (emphasis in original). The majority reasons that because "the average air traveler's experience instructs that Blacks and Hispanics comprise far less than fifty percent of all airline passengers," id., this statistical disparity supports at least a suspicion of discriminatory treatment. The short answer is that law enforcement officers are not constitutionally required to stop minority and non-minority citizens in exact proportion to their relative percentages of the air travel population. However, to the extent that Fourth Amendment jurisprudence may be susceptible of statistical precision, it seems to me that the issue, for present purposes, is not whether particular passengers are stopped in proportion to the percentage their respective groups constitute of all air travellers, but whether they are stopped in proportion to their likelihood, based on all relevant factors, to be carrying drugs