UNITED STATES of America,
Plaintiff–Appellee,

v.

Darrell HILL (97–5009) and Donald L. Gunn (97–5010), Defendants–Appellants.

Nos. 97–5009, 97–5010.

United States Court of Appeals,
Sixth Circuit.

Argued March 20, 1998.

Decided June 1, 1998.

338

Charles P. Wisdom, Jr., Asst. U.S. Attorney (argued), John M. Compton, Asst. U.S. Attorney (briefed), Lexington, KY, for Plaintiff–Appellee.

Charles P. Gore (argued and briefed), Turner, Trigg, Oakley & Gore, Lexington, KY, for Defendant–Appellant Hill.

J. Gregg Clendenin, Jr. (argued and briefed), Frankfort, KY, for Defendant–Appellant Gunn.

Before: WELLFORD, NELSON, and SILER, Circuit Judges.

## OPINION

WELLFORD, Circuit Judge.

Defendants Hill and Gunn appeal their convictions for possession of cocaine base and aiding and abetting, in violation of 21 U.S.C. § 844(a) and 18 U.S.C. § 2, and possession of cocaine base with intent to distribute and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Hill argues that a *Batson* violation occurred during the striking of the jury, that the district court erred in excluding certain testimony from one of the officers that participated in the arrest, and that his convictions are not supported by sufficient evidence. Gunn joins Hill's *Batson* argument, and also claims that the venire violated the fair cross section requirement. For the reasons that follow, we **REMAND** this case to the district court for further proceedings.

### I.

Hill and Gunn "passed out" in Hill's car as it sat at an intersection in Lexington, Kentucky, sometime before 5 a.m. on May 11, 1996. At about that hour, police responded to a call reporting a driver passed out at the wheel of his vehicle. Officer Warren, the first patrolman on the scene, observed the vehicle sit through two cycles of the stoplight before he approached the vehicle, whereupon he found Hill sitting in the driver's seat with his foot on the brake, the car in gear and the engine running, and Gunn in the passenger seat.

When Warren approached the car, he reached in, put the car in park and turned off the ignition, awakened Hill, and arrested him. Warren handcuffed Hill and put him in the back of his patrol car. After running a check on both Hill and the vehicle, Warren determined that the vehicle belonged to Hill.

Warren's backup, Officer Richardson, arrived at about the time Warren approached Hill's car. Richardson occupied himself with Gunn. With some difficulty, Richardson roused Gunn, got him out of the car, and searched him. Richardson found $902 in Gunn's jacket pocket, some of which was bundled up and wrapped in rubber bands, and some of which consisted of individually wadded up $20 bills. Richardson also discovered a small rock of crack cocaine in a cellophane bag in Gunn's sock.

After Gunn and Hill were securely in custody, Richardson searched Hill's car, where he found cellophane bag containing a "golf ball size chunk" of crack cocaine in the center console. That chunk was later discovered to weigh 19.89 grams. Trial testimony indicated that a one-gram rock of crack cocaine is approximately a two-day supply.

Hill and Gunn were indicted and ultimately found guilty of possession and possession with intent to distribute cocaine base. Prior to trial, however, as the jury was being struck, the prosecutor, Mr. Compton, used a peremptory challenge to exclude Juror 101, a black woman and the only black member of the venire. Hill's counsel made an objection to the government's challenge. The following colloquy occurred:

MR. GORE: I want to raise a question. The one black member of the jury, No. 101, if she was struck by the government, I would want to challenge that.

THE COURT: Mr. Compton?

MR. COMPTON: On what basis, if I might ask?

MR. GORE: She's the only black juror panel member. Both defendants are black, and that might have been racially motivated.

MR. COMPTON: Well, Your Honor, I can assure the Court that it was not racially motivated. I didn't—I scratched her off my list to start with. I didn't realize she was here. And then, when she was called, I don't even know where she was sitting, but I just—in exercising—there are certain ones that I had gone through that I would want to strike. And it was not because the woman was black, I can assure you of that. She has been on other juries and has served well.

THE COURT: She was on the jury last week.

MR. COMPTON: Yeah. I don't strike jurors because they're black or white or

**340**

the defendants are black or white. You have certain feelings about certain jurors in certain cases, and it was not because she was black.

THE COURT: All right. What was the basis of striking her?

MR. COMPTON: Well, this is a case—or one that I think is a circumstantial case, not unlike others. I can't really say that I did it for any reason other than I just—there was some jurors I just didn't want. I don't know. I can't tell you why I struck her, any more than I can why I struck Mr. Mudd or any of the others. I don't know how to answer that, because I just don't think black and white in these cases.

THE COURT: Mr. Gore?

MR. GORE: I think people get—as a defense attorney, I strike people when I have reasons for striking people. And I think it's just suspect when there's one black member on the whole panel and that one black member gets struck by the prosecutor when we have two black defendants. The trial last week did not have black defendants.

MR. COMPTON: I believe she's served on other juries, Your Honor. All I can tell you is I did it without regard to what color she was. Whenever the names are called out, you know, I generally just have certain people that I'll just strike. And for that particular reason, I don't—I can't really say why I struck this woman.

THE COURT: You're telling the Court there was no racial motivation?

MR. COMPTON: Your honor, I assure you, my background and my relationship with people of the black race since 1962, when I started teaching at Bryan Station, I have had close and personal contact with any number of blacks. They're in my home at least once a month. It's just not a motivation that I would have.

THE COURT: All right.

MR. COMPTON: I really can't think of any particular reason why I struck her any more than I did any of these other people. But I assure you it wasn't on black and white.

THE COURT: All right. Anything else, Mr. Gore?

MR. GORE: Just note my objection to that.

MR. CLENDENIN: I'll join in the objection for the record.

THE COURT: I'm satisfied that there was no racial animosity—or motivation. We will note your objection, though.

Hill and Gunn proceeded to trial with an all-white jury. Both defendants properly preserved for appeal the issues they now raise before this court.

## II.

### A. The *Batson* Challenge

██ The government cannot use its peremptory challenges in a criminal case to exclude members of the venire from the jury solely on the basis of their race. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a defendant opposing the government's use of a peremptory strike on the basis of race makes out a prima facie case of purposeful discrimination by showing:

> that he is a member of a cognizable racial group ... that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race .... [and] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 96, 106 S.Ct. 1712. The Court has subsequently modified the requirements of a prima facie *Batson* case to allow defendants to challenge the prosecution's allegedly race-based strikes of potential jurors even where the defendant and the stricken juror are of different races. *Powers v. Ohio*, 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). If the defendant successfully makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for its challenges. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. Finally, the trial court must decide "whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett v. Elem*,

514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). We may reverse that finding of fact only where we find clear error. *Id.* at 369, 111 S.Ct. 1859.

■ In *Purkett,* the Court explained that the three steps involved in the *Batson* analysis are separate and distinct, reversing a Court of Appeals decision which had erroneously combined the second and third steps of the analysis. 514 U.S. at 768, 115 S.Ct. 1769. The *Purkett* Court further instructed that in order to satisfy its burden under the second step of the analysis, the government's race-neutral justification need not be persuasive, or even plausible, but merely facially valid. *Id.* at 768–69, 115 S.Ct. 1769 (finding an explanation that the stricken jurors had long, unkempt hair and goatees facially valid). *See also Hernandez,* 500 U.S. at 356, 111 S.Ct. 1859 (involving a challenge on the basis that the Latino veniremen might be unable to accept an interpreter's version of witness' testimony rather than interpreting the Spanish on their own);*United States v. Tucker,* 90 F.3d 1135, 1142 (6th Cir.1996) (upholding a challenge to a prospective Latino juror deemed "too unintelligent and disinterested to serve"); *United States v. Scott,* 26 F.3d 1458, 1466 (8th Cir.1994) (deeming satisfactory the explanation that the stricken black venireman was the only one who volunteered the verdict reached in his previous jury service); *United States v. Ferguson,* 23 F.3d 135, 141 (6th Cir.1994) (finding sufficient the explanation that the stricken black venireman claimed to have been wrongly beaten by police 20 years earlier). However, the government must articulate some race-neutral reason for the strike; "merely denying that [the prosecutor] had a discriminatory motive or ... merely affirming his good faith" will not meet the government's burden of production. *Purkett,* 514 U.S. at 769, 115 S.Ct. 1769.

### 1. *Batson* Step One—Prima Facie Case

■ In this case, Hill's counsel, Mr. Gore, attempted to satisfy his burden of showing a prima facie case of purposeful discrimination by pointing out that the government struck the only black member of the venire and that the defendants in this case were black, whereas this same potential juror had served the previous week on a criminal jury with the same prosecutor in a case where the defendants were white. We need not decide whether, under these circumstances, defense counsel satisfied his burden of making out a prima facie case under *Batson,* for this issue became moot when the prosecutor offered his explanation for the strike and the court "ruled on the ultimate question of intentional discrimination." *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. It matters not, therefore, that the district court never ruled on whether the opponent of the strike had successfully made out a prima facie case; "because the district court here issued its ruling after considering the prosecution's explanation, the question in the instant case boils down to whether the appellants established by a preponderance of the evidence that the peremptory strikes were intentionally discriminatory." *Tucker,* 90 F.3d at 1142.

### 2. *Batson* Step Two—Facially Valid Reason for the Strike

The prosecutor's attempt to meet his *Batson* burden consisted of repeatedly claiming that he did not know why he struck Juror 101 any more than he knew why he struck other potential jurors, but he assured the court that he did not exercise the challenged strike because of Juror 101's race. The prosecutor explained that he based his strikes in this case on his gut feelings about the potential jurors: "You have certain feelings about certain jurors in certain cases, .... there was just some jurors I just didn't want.... Whenever the names are called out, you know, I generally just have certain people that I'll just strike."

Under *Batson* and *Purkett,* a mere denial of an impermissible motive and assertion of good faith would not satisfy the government's burden in responding to a prima facie case of purposeful discrimination. *See Purkett,* 514

.U.S. at 769, 115 S.Ct. 1769. We are also aware, however, that the prosecutor's burden of production at the second step of the analysis is light. *Id.* The prosecutor in *Purkett* partially explained his strikes thus: "And *I don't like the way they looked,* with the way the hair is cut, both of them. And the mustaches and beards *look suspicious to me.*" *Id.* at ·766, 115 S.Ct. 1769 (emphasis added). We view the prosecutor's articulated reason in ·*Tucker,* a reason we held met the burden of production, to be little more than an expression about the prosecutor's "gut feelings" about the particular Latino venireman struck in that case. *See* 90 F.3d at 1142 (upholding a strike of a prospective juror deemed "too unintelligent and disinterested to serve").

The issue of whether the prosecutor met his second-step burden needs an articulated explanation by the district court. The third step of the *Batson* analysis, not the second, may also be the proper place to assess the strength of the prosecutor's asserted reason. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. We shall also proceed to the third step of the analysis.

### 3. *Batson* Step Three—Proof of Purposeful Discrimination

 At this step of the analysis, the district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances, and then to weigh the asserted justification against the strength of the defendant's prima facie case under the totality of the circumstances. Thus, even though the issue of whether the defendants made out a prima facie case is moot for purpose of deciding whether they met their burden of production at step one, the district court may still assess the totality of the circumstances surrounding the strike in the analysis of whether the defendants have met their ultimate burden of proving purposeful discrimination. *See Hernandez,* 500 U.S. at 369–70, 111 S.Ct. 1859 (holding, in a case where the sufficiency of the prima facie showing at step one was moot, that "[t]he trial court took a permissible view of the evidence in crediting the prosecutor's explanation" and listing circumstances the court

might have considered in reaching that conclusion).

The record before us indicates nothing about the district court's thought processes in its step three analysis, apart from its abrupt conclusion indicating the apparent view that the prosecutor's asserted justification outweighed Mr. Gore's showing under the totality of the circumstances. Without a fuller indication of the circumstances that apparently led the district court to this conclusion, however, we cannot properly review the decision. *See United States v. Sangineto–Miranda,* 859 F.2d 1501, 1520 (6th Cir. 1988) (indicating the need for a "full record for intelligent appellate review"). We indicated in *Sangineto–Miranda* that some of these circumstances might include:

1) the racial composition of the initial group seated and the final jury panel sworn; 2) the number of peremptory strikes allowed each side; and 3) the race of those who were struck or excused from the jury panel throughout *voir dire* (whether for cause or by a peremptory challenge), the order of strikes, and by whom they were exercised. In an appropriate case, it may also be useful to consider evidence as to the percentage of the "cognizable racial group" in the jury pool, or the racial composition of the district wherein the jury pool is selected.

*Id.* (footnote and citation omitted).

The appellate record before us indicates that there was only one black member of the venire and that the final jury panel was otherwise composed entirely of white people. We therefore also surmise that all of the for-cause and peremptory challenges, with the exception of the strike exercised to exclude Juror 101, were used to exclude white potential jurors. The record also indicates that defendants Hill and Gunn shared 11 peremptory strikes and that the prosecution had seven such challenges. However, the current record tells us nothing about the order of strikes, who exercised them, or the racial composition of the district in which this case was tried. The record also denies us the district court's thoughts as to how these factors, and any others not enumerated in *Sangineto–Miranda,* weighed on the district

court's conclusion in the third step of the *Batson* analysis. Lacking the benefit of a detailed explanation of the district court's thinking on this issue, we cannot satisfactorily review its decision.

We therefore **REMAND** the *Batson* issue to the district court for further proceedings consistent with this opinion.

### B. The Challenge to the Venire Under the Fair Cross Section Requirement

■ Gunn asserts that the jury pool from which the petit jury was struck violated the fair cross section requirement. This assertion is based *not* on the fact that the venire contained only one black person, but on: 1) the fact that several potential jurors had previously served on juries in cases where the same prosecutor had represented the government, and 2) Gunn's counsel's allegation that the prosecutor "hasn't lost any cases" (an allegation that, as the district court pointed out, was completely untrue). Thus, Gunn's argument goes, the venire was not a fair and impartial cross section of the community because it was full of potential jurors who had shown a willingness and propensity to convict, especially when paired with this particular prosecutor.

■ The Supreme Court held in *Taylor v. Louisiana* that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Explaining the holding, the *Taylor* Court emphasized that: "Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 538, 95 S.Ct. 692 (citation omitted). A prima facie case of a fair cross section violation requires the defendant to show:

1) that the group alleged to be excluded is a "distinctive" group in the community; 2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

■ We are not prepared to hold that a complaint such as Gunn's triggers fair cross section analysis because we do not believe that a group of persons defined by their prior jury service and alleged disposition to render a particular verdict can be "distinctive" in the community for purposes of the first *Duren* element. Gunn therefore fails to make out a prima facie violation of the fair cross section requirement. Moreover, the district court in this case found that the panel was impartial, a finding entitled to deference and reversible only upon an abuse of discretion. *See United States v. Apodaca,* 666 F.2d 89, 94 (5th Cir.1982) (finding no abuse of discretion in denying a challenge for cause where a potential juror formerly connected with the FBI had averred that she could be impartial in weighing the testimony of FBI witnesses). This case presents no such abuse of discretion, particularly where Hill's counsel asked the potential jurors whether their prior jury service would impact their ability to decide this case fairly and impartially, Gunn's counsel stressed that seated jurors would be required to exercise their own independent judgment and decide the case based on the facts, and no juror indicated in response to these questions that they doubted their ability to so serve. We conclude that neither an abuse of discretion nor a constitutional error occurred with respect to the composition of the jury pool.

### C. Claim Based on the Exclusion of Expert Testimony

■ Hill argues that the district judge erred in not allowing him to question Officer Richardson about the significance of the half-bundled, half-wadded up manner in which Gunn carried the money in his pocket. Hill contends that Richardson's testimony would have indicated that Gunn was carrying money in a manner consistent with the way drug

dealers carry it. The district court did not allow Richardson to testify on this issue since the testimony would not "be particularly helpful to anyone" and since it did not deem Richardson to be an expert in this area.

 This court reviews a district court's decision not to admit expert testimony based on a lack of qualification for an abuse of discretion. *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994). We find the district court's evidentiary ruling to be within the bounds of its discretion; Richardson's testimony may well have been overly prejudicial to defendant Gunn, and thus subject to exclusion under Fed.R.Evid. 403. In any event, even if the district court's evidentiary ruling did constitute an abuse of discretion, we view any such error as harmless since the jury could infer Hill's guilt from other evidence, as the following section will show.

### D. Claim that the Conviction is Unsupported by Sufficient Evidence

 Hill also challenged the sufficiency of evidence supporting his conviction. The standard for evaluating such a claim presents a very difficult hurdle for the criminal appellant. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also United States v. Myers*, 102 F.3d 227, 234–35 (6th Cir.1996) (indicating that "this rule applies whether the evidence is direct or wholly circumstantial" and does not require evidence that would "exclude every reasonable hypothesis except that of guilt"), *cert. denied*, — U.S. —, 117 S.Ct. 1720, 137 L.Ed.2d 843 (1997).

In this case, the evidence of Hill's guilt consisted largely of circumstantial evidence and the testimony of co-defendant Gunn. Officer Warren testified that the car in which he discovered Hill and Gunn, and in which officers found a golf-ball size chunk of crack cocaine, belonged to Hill. Gunn testified that he and Hill attended a concert in Louisville the night before they were arrested, and after their return to Lexington, at about 4 a.m., he asked Hill to drive him over to Gunn's girlfriend's apartment. Before going there, however, they stopped at Hill's apartment, where Gunn said he smoked a crack cigarette and Hill gave him a corner of a baggie in which to store the unsmoked portion. In addition, Gunn testified that he saw Hill put a plastic baggie in his underwear as they were leaving his house to drive to the girlfriend's apartment. Gunn claimed that he did not put anything into the console, glove compartment, or door storage areas of Hill's car, and that he had never bought or possessed a rock of crack as big as the one found in Hill's car. In his own defense, Hill testified that Gunn had never been to Hill's apartment and denied ever "messing" with drugs, putting the big rock of crack in the console of his car, or putting a plastic baggie down the front of his pants.

Viewing all of the evidence in the light most favorable to the government, as we must, we consider it sufficient for the jury to find Hill guilty as charged. Upholding a conviction against a claim of insufficient evidence requires no more.

### III.

Because we find the appellate record insufficient to review the district court's determination with respect to the *Batson* inquiry, we **REMAND** this case for further proceedings consistent with this opinion. We find no merit in any of the defendants' other claims.