UNITED STATES of America,
Plaintiff–Appellee,

v.

Gary DeWayne BARKER,
Defendant–Appellant.

No. 01–6239.

United States Court of Appeals,
Sixth Circuit.

May 27, 2003.

Before: GUY, SUHRHEINRICH, and BATCHELDER, Circuit Judges.

PER CURIAM.

A federal jury found defendant, Gary DeWayne Barker, guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). In this appeal Barker argues that the prosecutor's strike of two African–American jurors violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and that the trial court erred in denying his motion to suppress evidence. After a review of the record, the applicable law, and the arguments, we affirm Barker's conviction.

## I.

In August 2000, three plain-clothes police officers, Mark Reed, Randall Greene, and Joe Witherspoon, were driving in an unmarked police car through a neighborhood in Hopkinsville, Kentucky. The unmarked police car had a red and blue light on the dash, but it was not turned on at the time. The officers were dressed in jeans and T-shirts with their firearms visible at their sides. Reed and Witherspoon had their badges displayed at their waists, and Greene's badge was hanging on a chain around his neck.

Three men were walking down a street, one of whom was Barker. The officers recognized one of the three men from a videotape of a controlled drug sale. They wanted to ask this man for his name and address so that an indictment could be obtained. The officers turned their car around and pulled to the curb near the three men. After exiting the car, Sergeant Reed said he told the three men "to come here, that we needed to talk to them." Two of the men (including the one on the videotape) came over to the officers, but Barker continued walking. As he walked away, Barker kept looking over his shoulder at the officers. Sergeant Reed started following Barker because he found this behavior to be "[v]ery suspicious."

Sergeant Reed again asked Barker to stop and talk. When Barker began running, Sergeant Reed started to chase him and yelled "Stop[,] Police." Sergeant Reed testified that Barker was "fumbling around on his waistband" while he ran and then threw a "shiny metallic" object over a fence. When Barker jumped up on a fence, Sergeant Reed pulled him to the ground.

Officer Greene then arrived and helped handcuff Barker. When Sergeant Reed asked Barker what he was doing, Barker replied that he was drunk and did not want to get arrested. Sergeant Reed retrieved the object thrown over the fence, which was a loaded 9–mm semiautomatic pistol. Later Barker told the officers that he ran because he thought the officers were robbers.

Barker filed a motion to suppress the firearm and his statements, which was denied by the district court after Sergeant Reed's testimony was taken at a suppression hearing. The first trial resulted in a mistrial after the jury was unable to reach a verdict.

There were only two African Americans on the jury panel at the second trial. In response to the court's questions, one of these jurors. Juror 23, stated that he was from Hopkinsville and knew of the defendant. He described it as a "casual knowing of him in the community." Juror 23 also stated that he had been a witness in a criminal case. The other juror, Juror 21, said he believed he had seen Barker in passing but did not know him and had never spoken to him. Juror 21 was familiar with the area where Barker was arrested through his employment with the Hopkinsville Housing Authority. Juror 21 also had contacted Sergeant Reed to ask him to play on his softball team, but Sergeant Reed never returned the call.

The prosecutor elected to use peremptory strikes for Jurors 21 and 23. Anticipat-

ing that Barker would make a *Batson* objection, the prosecutor offered the following reasons for his peremptory strikes:

[O]ne [of the jurors] indicated that he knew the defendant or knew of him, and the second indicated that he knew him in passing. And both gentlem[e]n indicated they were familiar with the neighborhood. One of them works for the housing authority in the Durrett Avenue area and for all of those reasons the government's going to move to strike them.

After reviewing the transcripts, the district court ruled that the prosecutor's explanation for the strikes was racially neutral, did not lack credibility, and was not pretextual. Before the jury was sworn, Barker moved for a new trial based on the denial of the *Batson* challenge. At Barker's request, the district court asked the prosecutor to explain how the government would be prejudiced by allowing the two African Americans to remain on the panel. The prosecutor responded:

[T]he two individuals that we struck are persons that indicated they knew or knew of the defendant. Mr. Barker has a lot of relatives in that area, including a fellow named Peaches Barker, and a number of other people who are into some rather unsavory deals. It is our position that, and I don't mean to, I'm not trying to make a pun, but it's pretty black and white when somebody says they know the defendant, that they should be struck, and the fact that the person[s] who knew him were African–American does not negate that fact. I mean if there were six white people on this panel who knew the defendant I would have struck every single one of them. I would have struck anybody anytime who knew the defendant because they bring to the courtroom things that persons who do not know this person don't. They bring in extraneous

matters and they bring in any kind of conclusions that they have drawn about that person, things that they've heard about that person and feelings that they might have for that person or persons who know him. So, I, I do not understand the outrage of the defense. I appreciate the advocacy involved, but it is such a clear-cut matter for the government to strike anybody who knows the defendant, just like it would be for the defense to strike anybody who knew the lead officer or anybody who knew me. When somebody knows a party they cannot participate because they cannot, despite their willingness to do so, despite their best efforts, they cannot be fair, they cannot be as impartial as those who do not know the parties involved.

The prosecutor also added:

I only know the people that they know that they associate with Mr. Barker and the people who know Mr. Barker then that's a very fair assumption for me to draw. I'm not trying to impugn their character, but I have to go with what I have and what I have is persons who know Mr. Barker. Mr. Barker is a convicted felon, Mr. Barker associates with drug dealers, Mr. Barker was carrying a gun that day. That's a pretty legitimate, it's an incredibly legitimate concern to have on the part of the government.

The district court denied the motion for new trial. Barker was convicted after the second jury trial, and this appeal followed.

## II.

### A. The Batson Challenge

■ Barker argues he was denied a fair trial because the prosecution struck the only two African Americans from the jury pool. The Equal Protection Clause prohibits purposeful racial discrimination in the selection of a jury. *Batson v. Ken-*

*tucky,* 476 U.S. at 79, 106 S.Ct. 1712. A defendant must first establish a *prima facie* case of discrimination. The burden then shifts to the prosecution to present a neutral explanation for having excluded the jurors. In order to satisfy its burden, the prosecutor's race-neutral justifications need not be persuasive, or even plausible, but merely facially valid. *See United States v. Hill,* 146 F.3d 337, 340–41 (6th Cir. 1998). The trial court must then decide " 'whether the opponent of the strike has carried his burden of proving purposeful discrimination.' " *Id.* (quoting *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). Great deference is given to a district court's findings on the credibility of the prosecution's asserted neutral explanations. Those findings may be reversed only for clear error. *See Hill,* 146 F.3d at 341.

The prosecutor in this case explained that he exercised the peremptory strikes because the two jurors knew or knew of Barker and were familiar with the neighborhood where Barker was arrested.[1] Barker challenges this explanation as not being reasonably race-neutral because the jurors did not *personally* know Barker, and because they said they could be impartial.

Barker has not made out a case of racial discrimination under *Batson.* While simply knowing of a defendant may not be a particularly persuasive reason for striking a juror, we are mindful that the government's articulated reason need not be persuasive or even plausible so long as it is race-neutral. The prosecutor expressed the race-neutral concern that these jurors could reach conclusions and develop feel-

ings about Barker based on their prior knowledge of him in the community. The district court was in a unique position to credit or discredit this explanation, and the district court found that explanation to be credible. Because of the deference we must give the district court's perception of the validity of the prosecutor's race-neutral justifications, Barker's *Batson* challenge fails. After carefully reviewing the record of the *voir dire* and the parties' arguments, we find no basis for disturbing the district court's determination that there was no *Batson* violation.

**B.  Suppression Motion**

■  Barker argues that evidence of the firearm and his statements should have been suppressed because the actions of the police officers in this case violated his equal protection and Fourth Amendment rights. A review of the transcript of the second trial that resulted in Barker's conviction shows that no evidence regarding his statements was offered into evidence. We will, therefore, only address the district court's ruling on the firearm.

This court reviews the district court's findings of fact in a suppression hearing for clear error and its conclusions of law *de novo.* The ultimate decision by the district court as to whether the facts of the case establish a Fourth Amendment violation is reviewed *de novo. See, e.g., United States v. Avery,* 137 F.3d 343, 348 (6th Cir.1997). The evidence is reviewed "in the light most likely to support the district court's decision." *United States v. Navarro–Camacho,* 186 F.3d 701, 705 (6th Cir. 1999) (internal quotation marks and citation omitted).

---

1. At the trial, the prosecutor agreed for the sake of expediency that a *prima facie* case existed. The government is not willing on appeal to concede that the facts in this case establish a *prima facie* case as a matter of law. However, once a party has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the challenger has made a *prima facie* showing becomes moot. *See Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

The Fourth Amendment protects persons and their possessions from unreasonable searches and unreasonable seizures. *Avery*, 137 F.3d at 348. Barker argues that evidence regarding the firearm should have been suppressed because the officers had no reasonable suspicion to approach, follow, or chase him. We need not assess the reasonableness of Sergeant Reed's suspicions concerning Barker, however, because no "seizure" within the meaning of the Fourth Amendment had occurred when Barker threw the firearm over the fence. In *California v. Hodari D.*, 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court held that anything that a suspect discards while fleeing from police may be used as evidence of guilt because it is not the fruit of a seizure. Seizure occurs under the Fourth Amendment either where there is an application of physical force, however slight, or submission to an officer's show of authority to restrain the suspect's liberty. Like the defendant in *Hodari*, Barker remained untouched by the officer at the time he discarded the firearm. Sergeant Reed's yell of "Stop[,] Police" may have been a show of authority, but there was no seizure because Barker continued to flee. *Id.* at 625–26. *See also United States v. Williams*, 949 F.2d 220, 222 (6th Cir.1991) (officers yelling "halt" and chasing defendant was not a "seizure" until defendant was stopped and arrested). Accordingly, the district court did not err when it found no Fourth Amendment violation.

■ Barker also argues that evidence of the firearm should have been suppressed because the officers violated his equal protection rights under the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment provides a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures. Citi-

zens at all times have the right not to be exposed to unfair application of the law based on race. This protection is not dependent on whether or when a seizure occurs. Thus, we have concluded that a police officer who approaches and consensually interviews a person solely because of his race may violate the Fourteenth Amendment. *Avery*, 137 F.3d at 352–53.

To prevail under the Equal Protection Clause, Barker must prove that the officers in this case acted with discriminatory purpose when they approached him. *Id.* at 355. Barker offered no evidence–direct, circumstantial, or statistical–to support his equal protection claim. Instead, he argues that the fact that he was in the presence of a suspected drug dealer and the fact that Sergeant Reed gave contradictory testimony on whether he identified himself as a police officer, "gives the appearance" that Barker was approached not because of reasonable suspicion but because he was black. Reed's alleged contradictory statements do not appear relevant to determining Reed's reasons for approaching Barker, unless Barker is arguing that this undermines Reed's other testimony. The district court, however, is best positioned to determine credibility, and, therefore, we will not disturb its credibility findings. *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir.1999).

Moreover, in arguing that Reed gave contradictory testimony, Barker relies upon testimony given at trial. Barker, however, did not renew his motion to permit the district court to determine whether the trial testimony undermined the suppression hearing testimony. "Unless the district court is given an opportunity to correct the error, an appellate court cannot review evidence presented at trial which casts doubt upon a pre-trial suppression motion." *United States v. Thomas*, 875 F.2d 559, 562 n. 2 (6th Cir.1989) (citation omitted). Our review, therefore,

is limited to the testimony from the suppression hearing.

Sergeant Reed's testimony at the suppression hearing supports the district court's finding that the officers approached Barker because he was walking with another man they had recognized from a videotape of a drug transaction and who they wanted to question. Barker has offered nothing more than mere speculation to contradict the race-neutral explanation given by the police. The district court did not err in finding that Barker did not establish an equal protection violation.[2]

**AFFIRMED.**

---

**2.** We do not decide in this case whether suppression is an appropriate remedy for a Fourteenth Amendment violation. *See Navarro–Camacho*, 186 F.3d at 711 (Moore, J., concurring) (suppression of evidence may be appropriate where investigatory practice has a discriminatory purpose and effect); *United States v. Jennings*, No. 91–5942, 1993 WL 5927, at *4 (6th Cir.Jan.13, 1993) (unpublished disposition) (suggesting suppression as remedy for seizure of evidence in violation of Equal Protection Clause).