*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0060P (6th Cir.)
File Name: 00a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

ALLIE RICHARD BUCHANAN
IV (98-1353), TROY SWINDLE
(98-1780), ALBERT DERRING
(98-1391), DERRICK C.
FLOWERS (98-1594),
CHARLES WASHPUN
(98-1590), RODNEY D.
ATKINSON (98-1538), OTIS
MURRAY III (98-1537),
EURTIS JONES (98-1535),
GEORGE KELLUM (98-1534),
and DARRYL FORD (98-1533),
*Defendants-Appellants.*

Nos. 98-1353/
1391/1533/1534/
1535/1537/1538/
1590/1594/1780

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 97-00082—Robert Holmes Bell, District Judge.

Argued and Submitted: October 25, 1999

Decided and Filed: February 17, 2000

1

Before: JONES, MOORE, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**  David W. Garrett, DAVID W. GARRETT & ASSOCIATES, Comstock Park, Michigan, Gaylor L. Cardinal, SLUITER, AGENTS, CARDINAL, VAN GESSEL, WINTHER & CARLSON, Wyoming, Michigan, William Mitchell III, SHERBOW & MITCHELL, Troy, Michigan, Kenneth A. Rathert, RATHERT LAW OFFICES, Kalamazoo, Michigan, John R. Minock, CRAMER, MINOCK & GALLAGHER, Ann Arbor, Michigan, Stuart G. Friedman, Ann Arbor, Michigan, Maureen M. Milliron, SHERBOW & MITCHELL, Troy, Michigan, for Appellants. Barbara Colby Tanase, UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Craig T. Wormley, MILLER & ASSOCIATES, Santa Monica, California, David W. Garrett, DAVID W. GARRETT & ASSOCIATES, Comstock Park, Michigan, Gaylor L. Cardinal, SLUITER, AGENTS, CARDINAL, VAN GESSEL, WINTHER & CARLSON, Wyoming, Michigan, William Mitchell III, SHERBOW & MITCHELL, Troy, Michigan, Kenneth A. Rathert, RATHERT LAW OFFICES, Kalamazoo, Michigan, John R. Minock, CRAMER, MINOCK & GALLAGHER, Ann Arbor, Michigan, Stuart G. Friedman, Ann Arbor, Michigan, Maureen M. Milliron, SHERBOW & MITCHELL, Troy, Michigan, C. Mark Pickrell, Nashville, Tennessee, for Appellants.  Barbara Colby Tanase, UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. Albert Derring, Bradford, Pennsylvania, Darryl Ford, Springfield, Missouri, Charles Washpun, Greenville, Illinois, Troy Swindle, Pekin, Illinois, pro se.

   GILMAN, J., announced the judgment of the court and, with one exception, delivered the opinion of the court. MOORE, J., concurred in the opinion except as to Part II.C.3 (the drug dog issue).  JONES, J. (pp. 20-25), delivered a

separate opinion in which he concurred in the above opinion except as to Parts II.C.3 and II.C.5 (the photo issue). MOORE, J., joined in this opinion only as to Part I, making it the opinion of the court as to the drug dog issue.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. The defendants in this action were convicted of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. They raise multiple issues in their appeals, including challenges to the jury selection process, to evidence admitted at trial, and to their sentences. For the reasons set forth below, we **AFFIRM** the convictions and sentences of all of the defendants except Allie Richard Buchanan, IV. As to Buchanan, we **AFFIRM** his conviction, but **VACATE** his sentence and **REMAND** the same for reconsideration in light of the district court's erroneous belief that it did not have discretion to depart from the applicable sentencing guideline.

### I.  BACKGROUND

#### A.  Factual background

This case involves a large-scale drug organization involving numerous individuals, including Rodney D. Atkinson, Buchanan, Albert Derring, Derrick C. Flowers, Darryl Ford, Eurtis Jones, George Kellum, Otis Murray, III, Troy Swindle, and Charles Washpun, all of whom are African-American. The organization, which began operating in and around Kalamazoo, Michigan in 1990, was formed by Keylen Tremell Blackmon, Buchanan, and Scott Hughes.

In broad outline, Blackmon, Buchanan, and Hughes obtained large quantities of cocaine, primarily from sources in Chicago, and would then distribute the drugs—in some instances after converting it into cocaine base ("crack")—to

various individuals in and around Kalamazoo. Atkinson, Derring, Flowers, Ford, Jones, Kellum, Murray, Swindle, and Washpun were all purchasers and/or sellers of the drugs obtained by Blackmon, Buchanan, and Hughes. The details of the charged conspiracy will, to the extent necessary, be discussed in connection with the defendants' specific assignments of error.

## B.   Procedural background

On June 5, 1997, a grand jury indicted twenty-four individuals—including Buchanan, Derring, Ford, Jones, Kellum, Murray, Swindle, and Washpun—with conspiracy to possess and distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. Four of the individuals were also charged with specific instances of possessing or distributing the illegal drugs.

A superseding indictment was filed on July 10, 1997, in which another individual not involved in these appeals was added to the conspiracy charge. The superseding indictment also contained money laundering charges and forfeiture allegations against some of the defendants. On October 1, 1997, Buchanan pled guilty to the conspiracy charge.

A second and final superseding indictment was issued on October 7, 1997. The new conspiracy charge omitted those defendants who were originally indicted but who had since pled guilty, such as Buchanan, and added four new individuals, including Atkinson and Flowers. In addition to those modifications, the alleged ending date of the conspiracy was changed from July of 1996 to June of 1997. Derring pled guilty on October 29, 1997.

By the beginning of 1998, all but fifteen of those indicted in the case had entered guilty pleas. Due to the relatively large number of remaining defendants, the district court assigned each individual to one of two trials. Atkinson, Flowers, Ford, Jones, Kellum, Murray, Swindle, and Washpun constituted the second group. On January 27, 1998,

photographs had an impact on the outcome of this trial. Their introduction was thus harmless error.

to create the inference that these individuals were engaged in illegal narcotics activity at those times.  Nor are we comforted, as the district court is, by the fact that the jurors were aware of and could "discount" the possible problems with dog-sniff evidence.  Federal Rule of Evidence 403 explicitly recognizes that certain evidence will "confus[e] the issues [] or mislead[] the jury," and it is the judge's duty to exclude such evidence when the potentiality of those effects substantially outweighs the evidence's probative value. Fed. R. Evid. 403.  We believe that in this case, the dog-sniff evidence carried just this risk.

Despite our concern on this issue, we do not think admitting the dog-sniff evidence was reversible error.  Even without that evidence, there is substantial other evidence linking both Murray and Washpun to the conspiracy and to specific criminal actions.

## II.

Second, I am uneasy with the government's use of the challenged group photographs in this case.  To an undiscerning eye, the use of the photographs showing the defendants in a relaxed social setting may seem to be of no evidentiary consequence.  To those who have been victims of the subtleties of race, however, the conditioning effect of such a display is most apparent.  In the context of this case, with the racial implications resulting from an all-white jury and an all-black set of defendants, I worry that the photographs, introduced as early in the trial as they were, likely had an improper, not-so-benign racial conditioning effect. Evidence relating to illicit relationships between defendants which might otherwise be viewed with skepticism may subconsciously have been granted a degree of credibility by virtue of the photographs at issue.  In other words, they introduce more prejudice than probative value.  Once again, however, given the broader evidence linking defendants together in this conspiracy, I do not believe the use of these

one day after their trial began, Swindle moved for a mistrial on the basis that Blackmon, without warning, revealed to the jury that Swindle had made a proffer to the government that he was, in fact, guilty of the offenses alleged in the indictments.  The district court, after concluding that a limiting instruction would be insufficient, granted the motion and ordered that Swindle be tried at a later date.

On February 3, 1998, a jury convicted each of the remaining seven defendants.  A separate jury convicted Swindle in late March of 1998.  Unless otherwise stated, references in this opinion to a "trial" are to the trial which resulted in the conviction of Atkinson, Flowers, Ford, Jones, Kellum, Murray, and Washpun, and which originally included Swindle.

On February 19, 1998, the district court sentenced Buchanan to 156 months of imprisonment.  Derring received a 145-month term of incarceration on March 12, 1998.  The district court imposed a 235-month sentence on Ford on April 4, 1998. On May 1, 1998, Atkinson, Flowers, Jones, Kellum, Murray, and Washpun were sentenced to respective terms of 240, 360, 240, 360, 300, and 300 months' imprisonment. Finally, the district court sentenced Swindle to a 324-month term on June 23, 1998.

The defendants then appealed, setting forth a variety of arguments relating to the jury selection process, the government's arrangements with certain witnesses, evidence admitted at trial, and their sentences. In several instances, the defendants' individual briefs incorporate by reference the contentions raised by their co-defendants.

## II.  ANALYSIS

### A.  Issues regarding the racial makeup of the jury and the jury selection process

#### 1.  *Standard of review*

A district court's ruling on whether a peremptory challenge violates the mandates of *Batson v. Kentucky*, 476 U.S. 79 (1986), is entitled to great deference, and this court will not disturb that ruling unless it is clearly erroneous.  *See Hernandez v. New York*, 500 U.S. 352, 364-65 (1991). "Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review *de novo*." *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998).  As to objections raised for the first time on appeal, we will not set aside the rulings of the district court unless they constitute plain error.  *See* Fed. R. Crim. P. 52(b); *United States v. Segines*, 17 F.3d 847, 851 (6th Cir. 1994).

#### 2.  *The defendants'* **Batson** *objection*

During jury selection, the government used a peremptory challenge to strike the only African-American person selected for the jury.  Citing *Batson*, the defendants argued that because all of the defendants were African-American, the challenge was racially motivated.  In response, the government asserted that it excused the juror because of an answer she provided in response to a written question asked of all potential jurors.  The question was as follows: "What newspapers, magazines and kinds of books do you read?" The juror at issue answered: "Grand Rapids press . . . , I read mysteries, romances and my Bible.  I listen to CNN.  I really don't trust our newspaper."

Based upon this and other answers, the government, prior to learning of each juror's race, assessed the desirability of each person.  The juror at issue had received a "fairly low" rating.  In response to the defendants' objection, and before

presumption against the admissibility of evidence of a canine's alert to currency, and that the government can rebut that presumption only if it first clearly and convincingly establishes, outside the presence of the jury, the relevance and non-prejudicial character of the offered evidence.

25 F.3d at 1216-17 (Becker, J., concurring in part, dissenting in part) (footnotes omitted) (emphasis supplied in original).

Given the unrebutted statistical studies in this and other cases, we find Judge Becker's view compelling.  We believe that courts should generally presume against the admissibility of dog-sniff evidence unless the government offers other evidence showing a direct nexus between illegal narcotics, the currency in question, and the defendant.  Further, when circumstances of the dog-sniff detection in any way cast doubt on the reliability of that evidence, such as in *Akins*, we believe courts should find such evidence inadmissible.  Under such a presumption, we believe that the facts of both Murray's and Washpun's arrests militated for exclusion of the dog-sniff evidence in question.  First, as in *Carr*, the government did not attempt to rebut the contamination studies.  Indeed, one officer testified that she was aware of studies showing that as much as seventy to ninety percent of currency is contaminated with some amount of controlled substances, J.A. at 1034-35, and none of the witnesses who testified as to the dogs' training countered those findings. Further, in neither case was there a nexus between the currency found and illegal narcotics.  The dog sniff in Murray's case followed a traffic stop, and although Murray was found with a large amount of cash, he possessed no narcotics. Similarly, the dog sniff in Washpun's case came after a routine traffic stop of a car in which Washpun was a passenger.  A dog "reacted" to currency in the glove compartment, as well as to money which had only seconds before been removed from Washpun's person.  Nevertheless, officers found no drugs in Washpun's car.  Given the studies cited above, we find it disquieting that prosecutors utilized dog-sniff evidence alone

Nevertheless, such cases also involved unique circumstances. In *Saccoccia*, the appellant had not presented findings to the district court regarding the non-reliability of such evidence, so those materials could not inform the district court's decision. *See* 58 F.3d at 777 n.19; *cf. Carr v. United States*, 25 F.3d 1194, 1202 n.3 (3d Cir. 1994) (declining to take judicial notice that nearly all currency contains detectable traces of narcotics). And in *Akins*, illegal drugs were found in the bag of the defendant whose money was also sniffed by a narcotics dog. *See* 995 F. Supp. at 814. Indeed, when there were other factors diminishing the reliability of a separate dog sniff, the *Akins* Court concluded that the evidence was unduly prejudicial and did not allow its admission. *See* 995 F. Supp. at 814 (finding limited probative value and unfair prejudice for a sniff of money which was contained in a drawer in a DEA interdiction room).

In *Carr*, Judge Becker voiced perhaps the strongest case for finding dog-sniff evidence inadmissible in particular cases:

If any of the many studies [regarding currency contamination] is valid, then the fact that a dog alerted to a large number of bills in United States currency which has circulated in a major metropolitan center (at which the studies are directed) is meaningless and likely quite unfairly prejudicial, *see* Fed. R. Evid. 403, and evidence thereof should have been excluded. Although having been directed to many of the studies . . . , the government in its brief has not disputed the validity of any of the studies mentioned above [nor] pointed to any countervailing studies . . . . It is thus my considered opinion that the fact that numerous studies by governmental and private agencies, studies which stand unrefuted, strongly suggest that a trained canine will alert to *all* bundles of used currency does not permit the jury to draw a *reasonable* inference that the person in prior possession of such currency was a drug trafficker or associated with one. Indeed, I am inclined to the view that the information now available establishes a strong

the district court commented on the strength of their challenge, the government stated that the last portion of the juror's answer—"I really don't trust our newspaper"—indicated, in its view, "a general distrust of what she read or saw or heard." The district court then overruled the *Batson* objection, finding the government's justification "logical" and race-neutral. On appeal, the defendants contend that the government's reason for the peremptory challenge was "merely subterfuge" for its "real purpose" of excluding the juror because of her race.

"The government cannot use its peremptory challenges in a criminal case to exclude members of the venire from the jury solely on the basis of their race." *United States v. Hill*, 146 F.3d 337, 340 (6th Cir. 1998). In determining whether such a violation occurred, the framework is well-settled:

To establish a violation of equal protection under *Batson*, the defendant must first make a prima facie showing that the prosecutor exercised peremptory challenges based on race. The burden of persuasion then shifts to the prosecution to articulate race-neutral reasons for the strikes. The prosecutor must convey a reason that is "clear and reasonably specific."

*United States v. Gibbs*, 182 F.3d 408, 438-39 (6th Cir. 1999) (citing and quoting *Batson*) (citations omitted). The reason given, however, "need not be particularly persuasive, or even plausible, so long as it is neutral." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999).

Here, the government offered its reason for striking the juror in question before the district court could evaluate whether the defendants had set forth a prima facie case. Such a sequence of events "renders the initial question of whether the defendant[s] established a prima facie case moot." *Id.* at 587 (citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991)). The prosecutor in this case, as noted above, expressed the belief that there was a risk that the juror would

"distrust" what she may hear or read during the course of the trial. This belief was based on the juror's written comment that she did not trust her newspaper. We conclude that such a belief, although perhaps not "particularly persuasive," was at least plausible and a sufficiently neutral justification to overcome the defendants' *Batson* challenge.

### 3.    The defendants' challenge to the jury venire

At the conclusion of the jury selection process, the defendants objected to the racial makeup of the entire jury panel itself, contending that it was not representative of the voting or driving population of the Western District of Michigan. In response to a request by the district court, the government called the jury clerk to testify about the procedures used to assemble jury venires in the district. The district court thereafter overruled the objection. In their appeals, the defendants assert that the Jury Selection and Service Act, 28 U.S.C. §§ 1861-78, and the Sixth Amendment entitled them to a jury venire that contained more African-Americans.

"The Sixth Amendment requires that the jury venire from which a jury is selected represent a 'fair cross-section' of the community." *United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)). The factors to consider are set forth in *Duren v. Missouri*, 439 U.S. 357 (1979), and are as follows:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

evidence.[2] In *United States v. $5,000 in United States Currency*, 40 F.3d 846 (6th Cir. 1994), this court held that the evidentiary value of the narcotics dog's alert was minimal, and "insufficiently indicative of probable cause." *Id.* at 848-49. The court cited cases and studies indicating that up to ninety percent or more of bills test positive for traces of cocaine. *See id.* at 849. This conclusion followed a previous panel which had found that dog-sniff evidence had only weak probative value. *See United States v. $53,082.00 in United States Currency*, 985 F.2d 245, 250 n.5 (6th Cir. 1993). Other circuits have similarly doubted the utility of such evidence. *See, e.g.*, *United States Currency*, *$30,060.00*, 39 F.3d at 1043 (concluding that statistics showing widespread currency contamination greatly diminishes the probative value of positive dog sniffs of money, and that continued reliance of courts and law enforcement officers on such evidence is "logically indefensible") (citation omitted); *United States v. $191,910.000 in United States Currency*, 16 F.3d 1051, 1062 n.21 (9th Cir. 1994) (noting that "[i]n recent years, courts have increasingly questioned the reliability of dog alerts" on currency); *Jones v. Drug Enforcement Agency*, 819 F. Supp. 698, 719, 720 (M.D. Tenn. 1993) (concluding that because contaminated currency is widespread, evidence of a "narcotic-trained dog's 'alert' to the currency is of extremely little probative weight").

Courts generally have not translated these doubts in the forfeiture realm into an outright prohibition under Fed. R. Evid. 403. *See, e.g.*, *United States v. Saccoccia*, 58 F.3d 754, 778 (1st Cir. 1995) (affirming admission of dog-sniff evidence); *United States v. Akins*, 995 F. Supp. 797, 814 (M.D. Tenn. 1998) (allowing dog-sniff evidence and concluding that it was not "unduly prejudicial").

---

[2]The issue of the reliability of dog-sniff evidence emerges in two different contexts: 1) as here, whether it should be allowed as evidence, and 2) whether it is sufficiently indicative of probable cause for forfeiture purposes.

---

**CONCURRENCE**

---

NATHANIEL R. JONES, Circuit Judge, concurring, with MOORE, J., joining in Part I only.

### I.

We concur with the majority, and agree with its reasoning on most aspects of this complex case. Nonetheless, we write separately because we are persuaded by Murray's and Washpun's argument that the officer testimony that trained canines reacted positively to currency found on them should have been ruled inadmissible. Both defendants contend that this "dog-sniff" evidence is inherently unreliable because it does not necessarily indicate drug activity on their part, citing studies finding that anywhere from seventy to ninety-six percent of United States currency is tainted with narcotics.[1] They presented these statistics to the district court through their motions *in limine* and oral arguments.

We agree that this dog-sniff evidence was inherently unreliable and that the court abused its discretion in admitting it. In recent years, this court and others have expressed skepticism regarding the probative value of dog-sniff

---

[1] Defendants cite two reasons that such a large percentage of currency is tainted with narcotics. First, when currency is run through a mechanized counter at a bank, narcotics contained on some of the currency gets into the counter and is transferred to other currency. Second, the ink on currency bonds with the narcotics. This argument echoes other courts' and studies' conclusions regarding "contaminated" money. *See, e.g.*, *United States v. United States Currency, $30,060.00*, 39 F.3d 1039, 1042 (9th Cir. 1994).

*Id.* at 364. In this case, the government acknowledges that African-Americans are a "distinctive" group for the purposes of the *Duren* analysis. But even if the defendants could show that the jury venire assembled for their trial was underrepresentative of their community, they have failed to show that such underrepresentation was the result of a "systematic exclusion" of African-Americans from the jury selection process.

The testimony of the jury clerk established that African-Americans comprise 4.58% of the total population of the counties located within the Grand Rapids jury wheel. Of those residents who qualify for jury service, 2.49% are African-American. In the instant action, there were two African-Americans in a venire of seventy, constituting 2.86% of the venire, which slightly exceeds the proportion of African-Americans in the Grand Rapids area qualified to serve as jurors. These statistics indicate that there was no violation of the fair cross-section requirement in this case. Moreover, even if the statistics could be viewed as underrepresentative, the defendants did not present any evidence of "systematic exclusion." Accordingly, we conclude that the district court did not err on this issue.

### 4. *The defendants' contentions regarding the method and manner of the jury selection process*

For the first time on appeal, the defendants take issue with the method and manner of the jury selection process. Specifically, they complain that the district court "unduly restricted" their ability to exercise their challenges by requiring that one attorney serve as lead counsel during voir dire, and by setting time limits for deciding whether to exercise a peremptory challenge on a particular juror. None of the briefs provide any detail concerning the time limits imposed. Pursuant to Rule 52(b) of the Federal Rules of Criminal Procedure, this court reviews such claims under the "plain error" standard. We find an insufficient basis in the

record to support the defendants' jury selection claims, much less any evidence of plain error.

**B.    Issue regarding leniency offered certain government witnesses**

The defendants contend that, by offering leniency to several witnesses who testified at trial, the government violated 18 U.S.C. § 201.  That section provides, in pertinent part, as follows:

> Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . . shall be fined under this title or imprisoned for not more than two years, or both.

*Id.* § 201(c)(2).

The defendants' challenge essentially invokes the now well-known Tenth Circuit decision of *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), which has since been vacated and rejected en banc, 165 F.3d 1297 (10th Cir. 1999).  Moreover, this court has previously ruled that such prosecutorial conduct does not implicate § 201(c)(2).  *See United States v. Ware*, 161 F.3d 414, 418-24 (6th Cir. 1998) (holding that § 201(c)(2) does not preclude the government from offering leniency to a defendant's accomplice in exchange for truthful testimony against the defendant). Accordingly, we find no merit in this argument.

**C.    Issues regarding evidence admitted during the trial**

***1.    Standard of review***

"The trial court's determinations of admissibility and relevancy depend on the exercise of sound judgment within the context of the entire trial.  The trial court's determination

**VACATE** his sentence and **REMAND** the same for reconsideration in light of the district court's erroneous belief that it did not have discretion to depart from the applicable sentencing guideline.

### 5.    *Other sentencing issues*

The other sentencing issues raised by the defendants concern the quantity of drugs attributable to each individual, the adequacy of the factual findings of the district court, and the fairness of their comparative sentences. We have carefully reviewed the record as to each of these contentions and find them to be without merit, much less rising to the "clearly erroneous" level.

## E.    Swindle's appeal

Swindle's counsel filed a brief on appeal and also a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). After a review of the entire record, counsel was of the opinion that there were no meritorious grounds for appeal. He did, however, identify nine conceivable issues. These included the questions of whether the buyers and sellers charged in the case could properly be considered a part of the charged conspiracy, whether statements of coconspirators were introduced against Swindle in violation of the hearsay rule, whether his criminal history score should include a point for a thirty-day sentence of secured detention imposed when he was a juvenile, and whether the district court erred by considering Swindle's prior marijuana conviction when assessing his criminal history. In a separate pro se brief, Swindle raises several of the challenges already discussed in connection with the other defendants, and further contends that his counsel rendered ineffective assistance by failing to request a lesser-included offense instruction and that the district court failed to determine at sentencing whether he should be held accountable for the criminal activity of others. Our review of the record convinces us that none of the above contentions has any merit.

## III.    CONCLUSION

For the reasons set forth above, we **AFFIRM** the convictions and sentences of all of the defendants except Buchanan. As to Buchanan, we **AFFIRM** his conviction, but

should not be disturbed absent a clear abuse of discretion." *United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 1991) (citations omitted).

### 2.    *Evidence of particular drug transactions involving Kellum and Murray*

At trial, evidence was admitted regarding the 1990 seizure of sixty-four crack "baggies" from Kellum. In addition, Murray unsuccessfully sought to exclude evidence of a controlled sale of crack by him to an undercover police officer in 1994. On appeal, both Kellum and Murray argue that the testimony by the police regarding the seizure and the drug transaction constituted evidence of "other acts" that should have been excluded pursuant to Rule 404(b) of the Federal Rules of Evidence. In response, the government contends that the testimony was admissible as evidence of acts in furtherance of the conspiracy.

Rule 404(b) provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). Here, however, Rule 404(b) is not applicable because the evidence constitutes "a continuing pattern of illegal activity." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). Even if Rule 404(b) applied in this situation, the district court did not abuse its discretion in

admitting the testimony because the evidence served the "legitimate purpose of showing the background and development of a conspiracy." *United States v. Paulino*, 935 F.2d 739, 755 (6th Cir. 1991) (citations and internal quotation marks omitted). Thus, the defendants' argument is without merit.

### 3. *Evidence of drug-sniffing dogs' positive indications of a narcotics scent on currency seized from Murray and Washpun*

In their appeal, Murray and Washpun also take issue with the district court's decision to admit evidence that dogs trained to detect the scent of narcotics reacted positively to currency seized from them. They contend that such evidence should have been excluded pursuant to Rule 403 of the Federal Rules of Evidence. In response, the government concedes that the Sixth Circuit views such evidence as having minimal probative value, but argues that the evidence is nonetheless admissible.

Rule 403, in pertinent part, provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. Prior cases support the proposition that because a high percentage of currency in circulation is tainted with a scent or residue of narcotics, evidence of a positive indication by a drug-sniffing dog may have minimal evidentiary value. *See United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 849 (6th Cir. 1994). Indeed, Judge Becker of the Third Circuit has set forth a compelling argument that there should be a strong presumption against the admissibility of such evidence. *See United States v. Carr*, 25 F.3d 1194, 1214-18 (3rd Cir. 1994) (Becker, J., concurring in part and dissenting in part). Other cases, however, instruct otherwise. *See, e.g.*, *United States v. Golb*, 69 F.3d 1417, 1428 (9th Cir. 1995) (holding that the district court did not abuse its discretion in admitting evidence of currency dog-sniffs and noting that "it was within the jury's province to resolve these competing opinions and

Criminal Procedure. Pursuant to Derring's plea agreement, the government had "agree[d] to make a good faith evaluation of [his] cooperation under th[e] agreement in determining whether to move for a reduction of [his] sentence . . . ." Derring contends that although his plea agreement did not *require* the government to make such a motion, the government's decision must have been based on an unconstitutional reason in light of his full cooperation. He suggests that the government discriminated against him on the basis of his age when it made a substantial assistance motion in connection with a younger co-defendant, but not himself. In response, the government argues that (1) Derring never objected at sentencing and (2) it declined to file a substantial assistance motion because of Derring's breakdown in cooperation, including a motion by Derring to withdraw his guilty plea.

The record does not indicate why the government chose not to move for a reduction. This fact, however, does not by itself imply that the government was motivated by an unconstitutional reason, nor does it entitle Derring to a hearing on the matter. *See United States v. Bagnoli*, 7 F.3d 90, 91-92 (6th Cir. 1993) (holding that the defendant was not entitled to a hearing as to whether the government acted unconstitutionally by not filing a substantial assistance motion, despite the fact that the defendant provided some assistance and the government did not expressly explain its reasons for declining to file the motion). In essence, the government has discretion in deciding whether to file a substantial assistance motion. That decision will not be questioned unless the defendant can make "a substantial threshold showing of an unconstitutional motive." *Id.* at 92. Our review of the record reveals that Derring failed to make such a showing. As such he was not entitled to a hearing and his argument on appeal is without merit.

not affirmatively show that the district judge knew he had such authority).

The district court specifically expressed its belief, however, that it could not consider Buchanan's alleged withdrawal from criminal activity prior to his arrest. At sentencing, the district court stated as follows: "[T]he guidelines definitely do not allow for the Court to look at that period of time between the time of ceasing of criminal activity and the time of apprehension to say this is a different level." Although we express no opinion as to whether such action warrants a downward departure, the district court was obligated to consider it because it is a mitigating factor that has not been adequately considered in formulating the Sentencing Guidelines. *See United States v. Coleman*, 188 F.3d 354, 358-60 (6th Cir. 1999) (en banc) (holding that a district court may not categorically exclude any non-prohibited factors from consideration for departure). In *Coleman*, we noted as follows:

> [T]here are an unquantifiable number of potential departure factors, including heretofore unknown factors that have not been previously considered by a court. Simply because a court has not directly ruled on the factor at issue does not excuse the district court from considering the factor as a potential basis for a downward departure.

*Id.* at 359. Accordingly, we must vacate Buchanan's sentence and remand the case to the district court for the limited purpose of considering whether Buchanan's alleged withdrawal from criminal activity prior to arrest warrants a downward departure.

### 4. *Derring's assertion that the government breached the terms of his plea agreement*

Derring challenges the government's decision to forego filing a motion to reduce his sentence for substantial assistance as permitted by Rule 35(b) of the Federal Rules of

determine what weight to accord the government's evidence"); *United States v. Saccoccia*, 58 F.3d 754, 777-78 (1st Cir. 1995) ("Even though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's alert still retains some probative value. . . . [T]hough the dog sniff evidence likely bolstered the prosecution's case and served to inculpate the defendant, we are not convinced that it presented a substantial risk of unfair prejudice.").

Given the uncertainty of this issue, Washpun's and Murray's arguments might have merit. Nonetheless, I see no need to presently decide the question of whether there should be a presumption against the admissibility of testimony regarding a drug dog's positive indications of narcotics residue on currency seized from a defendant. Even if the district court did in fact abuse its discretion in admitting the testimony regarding the dogs' alerts, any error was harmless in light of the substantial amount of other evidence linking both Murray and Washpun to the conspiracy and to specific criminal actions.

### 4. *The use of certain drug and packaging exhibits as demonstrative aids during the testimony of the government's drug-trafficking expert*

At trial, a government witness with expert knowledge of the inner workings of the drug-trafficking trade testified about the way in which drug dealers package and distribute narcotics. To illustrate the testimony, the government marked for identification purposes actual packages of powder cocaine and crack cocaine. These packages were never introduced into evidence, but were seen by the jury. On appeal, the defendants contend that the use of such demonstrative aids was inflammatory and improper.

We disagree. Our review of the record indicates no inappropriate use of the packages. Immediately after each

package was identified, the government, through questioning, established that the drugs exhibited were not seized from the defendants in this case. Moreover, the defendants failed to object to the use of the demonstrative evidence and did not request a limiting instruction. Based upon the foregoing, we conclude that the use of the packages was permissible.

### 5. *Other evidentiary issues*

The remaining evidentiary rulings challenged by one or more of the defendants concern the admissibility of photographs depicting the defendants consorting with each other and with other co-conspirators, the admissibility of a videotape showing Ford engaging in a drug transaction, and the timing of the government's disclosure of that videotape to defense counsel. After viewing the photos, we find nothing inflammatory or unfairly prejudicial about them, and our examination of the record as to each of the other contentions shows them to be without merit. There is no just basis to find an abuse of discretion by the district court on these evidentiary issues.

## D. Sentencing issues

### 1. *Standard of review*

A district court's factual findings underlying the application of the sentencing guidelines will not be disturbed unless found to be clearly erroneous. *See United States v. Mahaffey*, 53 F.3d 128, 131 (6th Cir. 1995). Sentencing issues raised for the first time on appeal will not be considered unless the underlying ruling constitutes plain error. *See United States v. Barajas-Nunez*, 91 F.3d 826, 830 (6th Cir. 1996). If the district court is aware of its discretion to depart from the guidelines on the issue before it, a decision to forego a downward departure is not appealable. *See United States v. Welch*, 97 F.3d 142, 152 (6th Cir. 1996).

### 2. *The nature of the drugs involved in the conspiracy*

For the first time on appeal, several defendants challenge the adequacy of the district court's findings with respect to the nature of the drugs involved in the conspiracy. They contend that there was insufficient evidence that the narcotics were crack cocaine as opposed to powder cocaine. This argument lacks merit. There was extensive evidence in the record that the conspiracy involved both forms of cocaine and that the defendants frequently "cooked" powder cocaine to convert it to crack. As this court has previously noted, the government may establish the identity of a drug by circumstantial evidence. *See United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir. 1994). Moreover, expert testimony is not necessary. A lay witness who has personal experience with crack cocaine can establish that a substance is, indeed, crack. *See id.* at 1439-40 (affirming the district court's finding that the substance involved was crack cocaine based on testimony from several government witnesses who had seen the defendant "cutting" crack or had seen the substance and knew it was crack based on their personal experience).

### 3. *Buchanan's motions for downward departure*

On appeal, Buchanan asserts that the district court erred by refusing to depart downward as to his criminal history category and his offense level. As noted above, a decision not to depart is unappealable unless a defendant can establish that the district court was unaware of its discretion to do so. With one exception, Buchanan has failed to make such a showing. A review of the record reveals that the district court specifically considered Buchanan's motions, but determined that a departure was not warranted. Such expressed consideration is a sufficient indicator that the district court was aware of its authority to depart. *See United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995) (rejecting the defendant's attempt to establish that the district court was unaware of its discretion to depart even where the record did