**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose REYES, Gilberto Felipe Hernandez, and Luis Arana, Defendants–Appellants.**

Nos. 99–1647, 99–1717, 99–1744.

United States Court of Appeals, Sixth Circuit.

Oct. 9, 2002.

Before RYAN, BOGGS, and COLE, Circuit Judges.

PER CURIAM.

Federal prisoners Jose Alberto Reyes, Gilberto Felipe Hernandez, and Luis Arana appeal their convictions on drug conspiracy, murder-for-hire, intentional killing in relation to a drug offense, firearms possession in relation to a drug offense, and witness tampering charges; they appeal their sentences under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We affirm the convictions and sentences of all defendants.

## I

Arana, Hernandez, and Reyes were charged with various crimes directly and indirectly connected to the death of Gil Debasa, Arana's former partner in a drug-dealing enterprise. Arana was the leader of a large-scale drug trafficking organization that moved cocaine between Miami and Detroit. Arana's partner was "Gallego" (Gil Debasa); the two had grown up in the same neighborhood of Havana, Cuba, and had been very close. Upon moving to the United States, Arana and Debasa began a cocaine importation ring. Arana sent cocaine from Miami to Detroit, and Debasa distributed the product in the Detroit area.

However, Debasa and Arana began to quarrel. Arana claims the dispute was about a woman; apparently a third party, named "Iran," made advances to Arana's girlfriend. Debasa was drawn into the conflict because both Iran and Arana were his friends. He told the two that he wished to remain neutral in the conflict. Arana thought that Debasa was taking sides with Iran, and became angry with him.

There were also disagreements about drug money. Debasa began to have trouble paying Arana for the cocaine that he had received. Arana stopped supplying Debasa with cocaine, because Debasa could not pay Arana for his previous shipments. Arana and Debasa eventually stopped working together; witnesses testified at trial that the money was the primary reason for the breakdown in the relationship.

Both Arana and Debasa continued to deal cocaine independently, although Debasa sold much less because his supply was disrupted by the dispute with Arana. Arana claimed Debasa owed him a substantial amount of money for cocaine based on their prior distribution relationship. Arana told Jose Balsce, an associate of the Arana cartel, that Debasa owed him $75,000, and told another witness that the amount was $46,000 plus a kilogram of cocaine.

Each defendant played a part in the slaying of Gil Debasa. The plot began when Arana offered Balsce $20,000 to murder Debasa. Balsce agreed, and Arana detailed Hernandez, a street-level drug dealer and enforcer, to help Balsce with the murder. Hernandez gave Balsce a gun, and drove the getaway car. On November 26, 1994, Balsce entered the V & L

Bar in Detroit, and shot Debasa multiple times. Debasa was mortally wounded, but was able to identify Balsce as the killer before dying. Hernandez and Balsce then traveled to Chicago immediately after the murder. Defendant Reyes gave the two money for a hotel room once they reached Chicago, and Arana reimbursed Reyes for the expense. Reyes then paid Balsce for the murder on behalf of Arana with $10,000 and a half a kilogram of cocaine.

Reyes also handled many other aspects of the Arana operation's day-to-day affairs, and was central to the drug distribution conspiracy, although his involvement with the murder was tangential. Reyes was a drug courier for the Arana organization; he transported up to 30 kilograms of cocaine from Miami to Detroit at a time. Reyes also managed important cocaine deals for Arana, and his house was the hub for the ring's distribution operation after the organization's "stash house" was raided by police. In a valid search, police recovered $87,000 in drug proceeds from Reyes's residence; $23,000 of that amount was in a hidden compartment. No cocaine was found during the search. Reyes claimed that the "cable guy" had found the money in the attic a few days before; the perspicacious "cable guy" also had allegedly found guns throughout the house. Reyes claimed to have no knowledge at all of the money in the secret compartment. Reyes kept records, however, and his records clearly included the entire $87,000, including the $23,000 in the hidden compartment. Reyes told a co-conspirator that the cocaine had already been distributed by the time of the search.

After their arrest, Hernandez and Arana were held in the same facility, but were kept in separate areas. Hernandez was in the segregation unit with another prisoner, Eugene Beaver, for four days. Hernandez asked Beaver to help intimidate cooperating witnesses who were kept in Beaver's section of the jail. Hernandez told Beaver to reveal the identities of the cooperating witnesses to the other prisoners. Hernandez knew the identities of the cooperating witnesses because he had copies of their interview reports; he gave copies of those reports to Beaver to take with him and pass around the facility. Beaver instead gave the reports to another prisoner, Mickey Solis, who gave the reports to the authorities. The FBI examined the reports and found Hernandez's fingerprints on them.

Defendants were convicted on all counts, largely on the testimony of Balsce, who testified for the prosecution. All four defendants were convicted of conspiracy to possess cocaine with intent to distribute (Count 1); Arana and Hernandez were convicted of murder-for-hire (Count 2); aiding and abetting an intentional killing (Count 3); and aiding and abetting a firearms murder in relation to a drug trafficking crime (Count 4). Hernandez was additionally convicted on a witness tampering charge (Count 5).

Reyes was sentenced to 235 months in prison. Hernandez was sentenced to four concurrent terms of life imprisonment on Counts 1–4, and a concurrent term of 120 months on Count 5. Arana was sentenced to four concurrent life sentences on Counts 1–4. The district court denied the defendants' motion for judgment of acquittal and for a new trial. They timely appealed.

## II

### 1. Joint Trial

Defendants argue that the district court should have tried the cocaine conspiracy separately from the murder. The defendants argue that the evidence of the murder inevitably colored the jury's judgments regarding the cocaine conspiracy. Reyes

especially argues for severance, as he was not charged with complicity in the murder at all. He argues that there were two separate and unrelated conspiracies: one to distribute cocaine, and one to commit murder.

A district court's decision to deny severance is reviewed for abuse of discretion. *United States v. Critton*, 43 F.3d 1089, 1098 (6th Cir.1995). In order to prevail, defendants must show a "specific and compelling prejudice" arising from the joint trial. *United States v. Harris*, 9 F.3d 493, 500 (6th Cir.1993). Here, the trial court did not abuse its discretion. There is a preference for joint trials in the federal system. *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The danger that a jury will convict a defendant charged only with a non-violent crime purely because of the violence of an offense with which co-defendants are charged is insufficient, standing alone, to mandate severance. *United States v. Mays*, 69 F.3d 116, 120 (6th Cir.1995).

There were numerous connections between the cocaine conspiracy and the murder, such that trying them together was efficient. The cocaine conspiracy benefitted by the assassination of the ring's business rival, Debasa. Balsce testified that the drug business was the real source of the conflict between Debasa and Arana. A witness testified that she had heard Hernandez discuss plans to kill Debasa because he had been encroaching on the Arana cartel's drug business. At the very least, Debasa's murder was an overt act in furtherance of the drug conspiracy, and would be admissible as such in a separate drug conspiracy trial.

The jury's verdicts on Counts 3 and 4 demonstrate the degree of connection between the conspiracy and the murder. Count 3 charged a violation of 21 U.S.C. § 848(e)(1)(A), which states that "any person engaging in an offense punishable under § 841(b)(1)(A) [a drug offense involving five or more kilograms of cocaine] ... who ... causes the intentional killing of an individual" may be given a sentence of up to death on that charge. In order to obtain a conviction under Count 3, the government had to prove that the murder was committed while the defendants were engaged in the drug offense charged in Count 1. Count 4, the 18 U.S.C. § 924 firearms charge, required that the use of the firearms be "during and in relation to any ... drug trafficking offense." Again, the jury was required to find that the firearm must have been used during or in relation to the drug conspiracy. Trying these various charges separately would have doubled the work of the court to no appreciable effect.

Similarly, the witness-tampering claim is also connected to the distribution conspiracy and the murder charges. The tampering was an attempt by Hernandez to silence cooperating witnesses. Evidence of the tampering would have been admissible at the drug or murder trials as spoliation of evidence, even if the tampering charge had been severed.

Finally, Reyes's rights were adequately safeguarded by a cautionary instruction. The court told the jury:

> In the course of Mr. Stern's examination of Mr. Balsce here ... testimony from Mr. Balsce has come out concerning Mr. Reyes's involvement with him after the alleged murder had taken place. I want to remind you that Mr. Reyes is not on trial for murder in this case. He is not charged with either of the murder counts in this case.

The court also reminded the jury, at the end of the case, to consider the evidence against each defendant only in light of the charge against that defendant.

■ Because the evidence would have been admissible in separate trials, and because the various counts were so connected as to be most efficiently disposed of in a single trial, the district court did not abuse its discretion in allowing a joint trial. We therefore affirm the district court's denial of defendants' motions to sever.

## 2. Grand Jury Abuse

Defendants claim that the indictment was flawed because (1) the case agent was the only witness to testify before the grand jury and (2) the indictment was based on hearsay evidence. We review the district court's refusal to dismiss the indictment for grand jury abuse for abuse of discretion. *United States v. Breitkreutz,* 977 F.2d 214, 217 (6th Cir.1992).

■ Neither objection is valid. Defendants cannot challenge the sufficiency or competence of the evidence presented to a grand jury. *United States v. Powell,* 823 F.2d 996 (6th Cir.1987). Agent Bartnowak testified at great length and in great detail to the grand jury—defendants present no evidence that the jury lacked information sufficient to make its determination. With regard to the objections on grounds of hearsay, the argument is spurious. Grand jury testimony not only may include hearsay, but an indictment may be based *entirely* on hearsay. *United States v. Mack,* 837 F.2d 254, 259 (6th Cir.1988). The district court did not abuse its discretion by allowing the case to go to trial.

## 3. Evidentiary Rulings

### a. Hernandez: prior wrongful acts and tools of the drug trade.

Hernandez complains that, under Fed. R.Evid. 404(b), the district court improperly admitted two pieces of evidence dredged from his spotty past. In 1992, Hernandez was arrested while carrying a firearm, and in 1995 he was apprehended carrying false identification. The 1992 arrest followed a car chase during which Hernandez fired at a police officer. Only the fact of the weapon was revealed to the jury; the chase and assault were not. The limited fact that Hernandez possessed false identification when he was arrested in 1995 was also revealed to the jury. Hernandez asserts for the first time on appeal that the district court should have given a cautionary instruction, *sua sponte,* regarding this evidence.

The evidence was relevant to the case, and was not offered to show prior wrongful actions by the defendant. The conspiracy count charged that defendants kept and used firearms to further the conspiracy. The Sixth Circuit has held that when "corroboration is direct and the matter corroborated is significant," Rule 404(b) does not prevent proof of other wrongful acts. *United States v. Blakeney,* 942 F.2d 1001, 1018–19 (6th Cir.1991). Possession of firearms is also admissible in drug cases as evidence of "tools of the trade," even if no firearms offense has been charged. *United States v. Ware,* 161 F.3d 414, 417–18 (6th Cir.1998). Possession of false identification was also an important part of the drug conspiracy; the fact that Hernandez was apprehended in 1995 in possession of false identification linked him to the then-ongoing conspiracy.

■ Finally, Hernandez did not ask for a curative instruction at trial. A trial court does not commit plain error merely because it fails to give curative instructions *sua sponte. United States v. Odom,* 13 F.3d 949, 956–57 (6th Cir.1994). The district court did not abuse its discretion in admitting the firearms and false identification evidence, and did not commit plain error in failing to give *sua sponte* cautionary instructions.

### b. Arana: prior wrongful acts.

Some of the testimony produced at trial predated the 1992 alleged starting date of the distribution conspiracy. Several witnesses, however, had been involved in drug trafficking with Arana before that time. Arana objected at trial that all of this evidence was only admissible under Fed. R.Evid. 404(b), and that since no pretrial notice was filed as required by that section, the evidence should be excluded as improper character evidence.

■ The district court properly admitted this testimony as background evidence. The Sixth Circuit held in *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir.2000), that background evidence is not barred by Rule 404(b). *Hardy* stated: "Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* at 748. The evidence here at issue showed the circumstances from which the conspiracy arose— the witnesses described the personal relationships and events in which the conspiracy took root. This is a proper use of background evidence, and we therefore affirm the district court's decision to admit the evidence. *United States v. Buchanan*, 213 F.3d 302, 311 (6th Cir.2000).

### c. Witness protection program.

Hernandez argues that the district court improperly admitted testimony that Jose Balsce would be placed in a witness protection program as part of the deal he received as a cooperating witness. Hernandez claims that this information was more prejudicial than probative. Fed. R.Evid. 403. A Rule 403 determination is reviewed for abuse of discretion. *United States v. Sassanelli*, 118 F.3d 495 (6th Cir.1997).

■ Hernandez was accused of encouraging another prisoner to reveal the identities of cooperating witnesses in an attempt to prevent them from testifying. The fact that it was necessary to place a witness in a protection program is probative of Hernandez's predilection for harming witnesses. The district court did not abuse its discretion in refusing to suppress the witness protection program testimony.

### d. Hernandez's nickname.

■ Hernandez was known to most of the witnesses who testified at trial by his nickname, Cemetario. Hernandez claims that the use of this nickname was irrelevant and prejudicial. Fed.R.Evid. 402, 403. We disagree. All of the defendants and most of the witnesses used multiple names and nicknames during their drug trafficking careers. The use of Hernandez's nickname was required because he used it while committing the crimes at issue, and because the majority of the witnesses knew him by that name. The district court did not abuse its discretion by allowing Hernandez to be identified by his nickname.

### 4. *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998).

Reyes argues that the district court should have suppressed the testimony of all of the cooperating witnesses, pursuant to the decision of the Tenth Circuit in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998). Reyes asserts that the government violated the federal anti-bribery statute, 18 U.S.C. § 201, by offering leniency to cooperating witnesses in exchange for testimony.

Reyes is incorrect. *Singleton* was vacated upon rehearing, heard *en banc,* and reversed by the Tenth Circuit. *United States v. Singleton,* 165 F.3d 1297 (10th Cir.1999) (en banc). Moreover, the Sixth Circuit has expressly rejected this argument, in *United States v. Ware,* 161 F.3d 414 (6th Cir.1998).

### 5. *Apprendi.*

All three defendants argue that they are entitled to resentencing under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). That case famously holds that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490. Because the defendants did not object to the alleged *Apprendi* error at trial, we review their claims for plain error. Fed.R.Crim.P. 52(b). The Supreme Court recently clarified the proper approach for determining whether an *Apprendi* error may be noticed under the plain error standard. *United States v. Cotton,* 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). The court stated: "[B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Cotton,* 535 U.S. at ——, 122 S.Ct. at 1785 (citations and quotations omitted).

21 U.S.C. § 841 contains a three-tiered sentencing structure. If a defendant is convicted of possessing (or in the case of § 846, conspiring to possess) any amount of drugs at all, he may be sentenced for 0–20 years in prison, under 21 U.S.C. § 841(b)(1)(C). Since a drug amount determination is not necessary, a judge may sentence a defendant under § 841(b)(1)(C) without a jury finding as to amount. Under § 841(b)(1)(B), a defendant is sentenced to a range of 5–40 years if a jury finds, beyond a reasonable doubt, that the crime involved at least 500 grams of cocaine. Under § 841(b)(1)(A), a defendant is sentenced to a range of ten years to life if a jury finds, beyond a reasonable doubt, that the crime involved at least five kilograms of cocaine.

Count 1 of the Sixth Superseding Indictment, on which all three defendants were convicted, includes the specific allegation that defendants violated 21 U.S.C. § 841(b)(1)(A)(ii). That statute sets a prison sentence of ten years to life for a drug offense involving five kilograms or more of cocaine.

Defendants argue that although the drug amount was included in the indictment, the jury did not find that more than five kilograms of cocaine were involved in the conspiracy. Reyes was sentenced to 235 months (just over 19.5 years) and is under the 20 year maximum to which a judge may sentence a defendant without a jury determination. 21 U.S.C. § 841(b)(1)(C); *United States v. Ramirez,* 242 F.3d 348 (6th Cir.2001). We therefore affirm his sentence, since no jury determination of a drug amount was required to impose that sentence.

Hernandez and Arana were both sentenced to the statutory maximum of life imprisonment on Count 1. In evaluating their *Apprendi* challenge, we find it especially important that the jury was required, as part of defendants' convictions for drug-related murder, under Count 3, 21 U.S.C. § 848(e)(1)(A), to find that the drug offense to which the murder was connected involved more than five kilo-

grams of cocaine. In order to convict under § 848(e)(1)(A), a jury must find that the defendant "engag[ed] in an offense punishable under section 841(b)(1)(A)...." 21 U.S.C. § 848(e)(1)(A). Accordingly, the jury instruction stated the first element of the § 848 drug-related murder charge as follows:

> First, that the defendant was engaged in a drug offense as described in Count 1 which alleges a drug conspiracy in which cocaine was transported from Miami to Detroit for further distribution, and that the drug offense involved in Count 1, as it indicates, involved five kilograms or more of a mixture or substance containing a detectable amount of cocaine.

The jury convicted Hernandez and Arana on the drug related charge, thereby finding that Count 1 involved five or more kilograms of cocaine.

■ We have heretofore suggested that where a trial court failed to include drug quantity as an element of the offense in the body of the jury instructions, the error is harmless when a "special finding" is made by the jury as to the drug type and quantity. *United States v. Flowal*, 234 F.3d 932, 937 n. 3 (6th Cir.2001). In the current case, we have no need to speculate whether the jury would have found that the drug conspiracy charged in Count 1 involved five or more kilograms of cocaine: the jury *actually made* such a finding as part of the Count 3 conviction. Although we consider the error here under the plain error standard, rather than the harmless error standard discussed in *Flowal*, we think this principle good for plain error review as well: the public reputation of the courts is not drawn into question by a sentence based on the jury's verdict on a specific drug amount. Here, as in *Cotton*, "[t]he real threat ... to the 'fairness, integrity, and public reputation of judicial proceedings'" would be if Hernandez and Arana, despite the jury's actual determination as to drug amount, were to receive a substantially lessened sentence because of errors that they did not object to at trial. *Cotton*, 535 U.S. at ——, 122 S.Ct. at 1787.

### III

For the above reasons, we AFFIRM defendants' convictions and sentences.